[Nos. 1986-1988.    Aug. 25, 1917.]

H. B. CARTWRIGHT & BRO. et al. v. UNITED STATES BANK & TRUST CO. et al. CARTWRIGHT et al. v. SAME. H. B. CARTWRIGHT & BRO. v. SAME.

### SYLLABUS BY THE COURT.

1. There is no particular formality required or necessary in the creation of a trust. All that is required is written evidence supplying every essential detail of the trust. Any agreement or contract in .writing, made by a person having the power of disposal over property, whereby such per-

son agrees or directs that a particular parcel of property or a certain fund shall be held or dealt with in a particular manner for the benefit of another, in a court of equity raises a trust in favor of such person claiming under him voluntarily or with notice. P. 114

2. Where a corporation in failing circumstances, by an argeement in writing, executed under seal, transfers to another corporation as trustee all its property and assets, and said agreement provides that such corporation trustee shall convert such assets into cash within a period of three years and distribute same to its creditors, and any balance remaining to its stockholders, such an agreement creates a trust in favor of the creditors accepting the same, and it is immaterial that such an agreement contained a provision giving to the creator of the trust, the trustee, and a third party the power to make other and different arrangements relative to a certain specified piece of real estate, in case it became necessary, where thereafter the three parties named by a subsequent arrangement caused the legal title to said real estate to be conveyed to such trustee and all parties thereafter treated such real estate as constituting a portion of the trust estate, and a director of the trustee corporation under such circumstances will not be heard to say that the corporation, of which he was a director, was not acting as a trustee for the creditors of the creator of the trust, where his object in so doing is to enable him to reap a benefit from his dealings with the trust property with his fellow directors.

P. 114

3. Where a corporation trustee acts upon the assumption that certain real estate is a part of the trust estate, a director of such corporation will not be heard to say that it was not in order that he may retain a profit made in dealing with such property. P. 114

4. The acceptance by a beneficiary of the trust in his favor is presumed until he rejects it. The fact that an assignment for the benefit of creditors may have been invalid and subject to attack by any of the creditors does not

aid a director of the trustee corporation where such corporation has accepted the trusteeship and proceeds to administer the trust, as such director is in no position to question the validity of the trust agreement or deed of assignment, or to question the right of the beneficiary creditors to call him to account as a director, where he has violated his duty in dealing with the trust property.          P. 120

5. A trust, in the modern and confined sense of the word, is a confidence reposed in a person with respect to property of which he has possession or over which he can exercise a power to the extent that he may hold the property or exercise the power for the benefit of some other person or object.          P. 120

6. While a director of a corporation is not disqualified from dealing with his fellow directors in regard to corporate property, nothing but the utmost good faith upon his part, supplemented by full and fair disclosure in advance to his fellow directors, will satisfy the requirements of the law and enable him to retain a profit made at the expense of the corporation.          P. 121

7. Where a corporation trustee is invested by the trust agreement with the power to sell real estate belonging to the trust estate, a director of such corporation cannot take an option of such real estate from his fellow directors and sell the same at an advance over his option contract and retain to his own use the profit so made.          P. 121

8. Where a trustee is guilty of any breach of trust, or of any vexatious or improper conduct, the court can withhold all compensation, or it can allow such compensation as will pay for the value of its services, so far as they have been beneficial to the estate. Where the trustee joins with one of the creditors, neither the trustee nor the court has any the profits made by such director upon an option contract obtained from the trustee upon trust property, the trial court properly denied such trustee a commission upon such moneys as to which it denied its trust relation.          P. 133

9. Where a debtor in failing circumstances transfers all his property to a trustee and directs the trustee to sell the same and apply the proceeds toward the liquidation of its indebtedness, specifying in the trust agreement certain claims which are to be given preference; i. e., labor claims, and that all the other creditors shall be paid pro rata, it is not competent for the trustee to make an agreement with one of the unsecured creditors to prefer such creditor as to his unsecured claim, in consideration of such creditor advancing to the trustee money to enable the trustee to acquire title to certain property for the benefit of the trust estate, without the knowledge or consent of the other creditors.

P. 135

10. Where one incurs expenses in rescuing property belonging to many, a court of equity has power to direct that the expenses so incurred shall be paid from the common fund. Where a creditor of the assigned or trust estate has advanced money for the preservation of the trust property, such creditor is entitled to reimbursement from the common fund for the money so advanced and all proper expenses incurred therein, but such creditor does not, by the advancement of such money, become entitled to a preference as to his unsecured claim over other creditors.

P. 135

11. Where a trust agreement for the benefit of creditors provides that if the real estate conveyed to the trustee should be sold for a stipulated price per acre, that the attorneys for the creator of the trust should be paid for their services a given sum and such trust agreement is accepted by all of the creditors, neither the trustee nor the court has any right to disregard such provision, and such attorneys are entitled to the compensation named in the trust agreement.

P. 143

Appeal from District Court, Santa Fé County; Abbott, Judge.

Suit for injunction by H. B. Cartwright & Bro. and others against the United States Bank & Trust Company,

United States Bank & Trust Company, trustee, Frederick Muller and Francis C. Wilson, in which Charles Haspelmath and others and First National Bank of Santa Fé intervened. Judgment for plaintiff, and defendants Muller and the United States Bank & Trust Company, Charles Haspelmath and others, intervenors, and Francis C. Wilson appeal. Affirmed as to appellant Muller and as to the trustee, reversed as to the preference given Cartwright & Bro. on its open account, and in so far as it denied Francis C. Wilson a preference as to his attorney's fee, and remanded to the district court for further proceedings.

Neil B. Field, of Albuquerque, for United States Bank & Trust Co.; United States Bank & Trust Co. Trustee, and Frederick Muller.

A director is under no disability to contract with the corporation of which he is such; provided he acts fairly and deals at arm's length with his fellow directors

Gay v. Y. M. etc. Co. 107 Pac. 237; 3 Thomp. Corps. Sec. 4059; Richardson v. Green, 133 U. S. 30; Twin Lick Oil Co. v. Marbury, 91 U. S. 587; Ft. Payne, etc., Co. v. Hill, 174 Mass. 224; Barnes v. Spencer & Barnes Co. 162 Mich. 509; Savage v. Medelia F. W. Co. 98 Minn. 343; Huffaker v. Germania, etc., Co. 46 L. R. A. 384; Figge v. Bergenthal, 130 Wis. 594, 614, and cases cited; Cowell v. McMillin, 177 Fed. 25, 39.

If the trust agreement was an assignment for benefit of creditors it was not subject to change without consent of creditors. McKellar v. Pillsbury, 48 Minn. 396; Scull v. Thompson, 3 N. J. E. 131; Seal v. Duffy, 4 Pa. St. 274; Minn. Nat. Bank v. Bank of Commerce, 94 Ill. 271.

But agreement was not an assignment for benefit of creditors. Burrell on Assign. (4th Ed.) Sec. 1; Beans v. Bullitt, 57 Pa. St. 221; Empey v. Sherwood, 12 Nev. 355; Secs. 327-376, C. 8, Code 1915; Schofield v. Folsom, 7 N. M. 601; In re Zeiger, 15 N. M. 150; In re

Ambrose Merc. Co. 229 Fed. 309; Missouri-American E. Co. v. Brown Shoe Co. 165 Fed. 283;

Effect of signature of note by adding word "trustee;" Sec. 614, Code 1915; Story on Promissory Notes, Sec. 63; Thacher v. Dinsmore, 5 Mass. 300; Foster v. Fuller, 6 Mass. 58; Taylor v. Davis, 110 U. S. 330.

Assignment of all of corporate property did not extinguish corporation.

5 Thompson Cor., Sec. 6482; Boston Glass Mfg. Co. v. Langdon, 24 Pick. 49; Same case, 35 Am. Dec. 292; Wallace v. Lincoln S. Bank (89 Tenn. 630), 24 American St. Rep. 625; United States v. Union Pacific Ry. Co., 98 U. S., 596-611.

"Though a contract be wholly *invalid* when executed. still (supposing it not to be prohibited by law as relating to some illegal transaction), if it be acted upon afterwards by the parties to it as valid, they will, if *sui juris,* be estopped thereafter to allege its invalidity."
Bigelow on Estoppel, 6th Ed., p. 746.

"If a person having a right, and seeing another about to commit, or in the course of committing. an act ₐin fringing upon that right, stands by in such a manner as to really induce a person committing the act, and who might otherwise have abstained from it, to believe that he assents to its being committed, he cannot afterwards be heard to complain of the act."
DeBrussche v. Alt, L. R. 8 Ch. Div. 286, 314.

See, also, King v. Stroup, No. 1811, decided at the present term of this court.   Dye v. Crary, 13 N. M. 439.

It is duty of trustee to defend title and his expenses are properly chargeable against estate.
Williams v. Gibbs, 20 How. 535; Myer's appeal, 62 Pa. St. 104; 39 Cyc. 497.

A. B. Renehan, E. R. Wright, and Daniel K. Sadler, all of Santa Fe, for appellees.

Frederick Muller, being a director of the incorporated trustee, is accountable to it and through it to the *cestius que trust* for the profits inuring to him by reason of his dealing with the trust property.

Greenville Gas Co. vs. Reis, 54 Ohio St., 549; 44 N. E. 271; Tenison v. Patton, 95 Tex., 285; McCord v. Naburs, 101 Tex., 494; Jenkins v. Hammerschlag, 56 N. Y. Sup. 534; Stanley vs. Luce. 36 Oreg., 25; 58 Pac. 75; Morgan v. Kang, 27 Colo. 541; Mosher v. Synnott, 27 Colo. Ap. 454; Miller v. Brown, 1 Neb. (Unof.) 754; Robbins v. Butler, 24 Ill. 387 (432); Jarrott v. Johnson, 216 Ill. 212; 74 N. E. 756; Frazier v. Jenkins, 64 Kans. 615; 68 Pac. 24; 57 L. R. A. 575; Perry on Trusts, (6th Ed.), Secs. 206, 430; Cook on Corporations, (7th Ed.), Sec. 653; Pomeroy's Eq. Jur., Secs. 958, 1077; Magee on Banks & Banking (2nd. Ed.), Sec. 103; 5 C. J., 1224; 10 Cyc., 799; Gay v. Young Men's Cons. Co-op. Inst., (Utah) 107 Pac. 237; Purchase v. Atl. Safety Dep. & Trust Co., 81 N. J. Eq., 344; 87 Atl. 444; Newcomb v. Brooks. 16 W. Va., 32 (58-94).

H. B. Cartwright & Brother, having alone and unaided by other creditors advanced the monies and assumed the obligations necessary to preserve the estate, without whose efforts in such behalf no fund would exist for distribution; and having been the first to discover the existence of a trust as to the profits claimed by the appellant Frederick Muller, and having successfully moved for the recovery thereof are entitled to compensation.

5 C. J. 1278; Reis v. Ravens, 68 Ill. App. 53; Johnson v. Blell, 61 Mo. App. 37 (44-45); In re Price, 171 N. Y. 526, 63 N. N. E. 526; Marvin v. Richardson, 52 Conn. 223.

H. B. Cartwright & Brother is not estopped to question the right of Frederick Muller to retain the profits resulting from his purchase and sale of the trust property.

16 Cyc. 726, 734-738, 741-742, 744-746; Owens v. Andrews, N. M. 131 Pac. 1004; Algodones Land & Town Co. v. Frank, N. M. 153 Pac. 1032; Dye v. Crary, N. M. 85 Pac. 1038; Adair v. Brimmer, 74 N. Y. 539 (554); Smith v. Howlett, 51 N. Y. Supl. 910; Adair v. Brimmer, 74 N. Y. 539 (554).

United States Bank & Trust Company was properly disallowed the claimed attorney's fee of one thousand dollars and trustee's commission on any greater sum as the sale price than that which after knowledge of the true sale price it treated as the sale price for the purposes of settlement under the trust agreement.

39 Cyc. 495; Perry on Trusts, 8919; In re Thompson, 101 Calif. 349 (355); Lehman v. Thompson, 159 Ill. 270 (248), 42 N. E. 777; Flagg v. Mann, 3 Summ. 84, Fed. Case No. 4848; Ward v. Shire, Ky. 658, W. 8; Warren v. Pazolt, 203 Mass. 328 (351); Folk v. Wind, 124 Mo. App. 577 (584); Welsh v. Bronw, 50 N. J. Eg. 38 (397); Dufford v. Smith, 46 N. J. Eg. 216 (223); Stephens v. Welcher, 152 N. Y. 551 (583); Fellows v. Loomis, Pa. 53 Atl. 999; Ralston v. Easter, 43 App. D. C. 513 (521-522); Weakley v. Meriwelther, Ky. 1608, W. 1054; Whiteside v. Whiteside, 35 Pa. Super. Ct. 481; Stone v. Farnham, R. I., 47 Atl. 211; McCord v. Nabors, 101 Tex 494 (503).

39 Cyc. 495; Perry on Trusts, 8919; In re Thompson, 101 Calif. 349 (355); Lehman v. Thompson, 159 Ill. 270 (284), 42 N. E. 777; Flagg v. Mann, 3 Summ. 84, Fed. Case No. 4848; Ward v. Shire, Ky. 658, W. 8; Warren v. Pazolt, 203 Mass. 328 (351); Folk v. Wind, 124 Mo. App. 577 (584); Welsh v. Brown, 50 N. J. Eg. 38 (397); Dufford v. Smith, 46 N. J. Eg. 216 (223); Stephens v. Welcher, 152 N. Y. 551 (583); Fellows v.

Loomis, Pa., 53 Atl. 999; Ralston v. Easter, 43 App. D. C. 513; (521-522); Weakley v. Meriwether, Ky., 1608, W. 1054; Whiteside v. Whiteside, 35 Pa. Super. Ct. 481; Stone v. Farnham, R. I., 47 Atl. 211; McCord v. Nabors, 101 Tex. 494 (503).

Francis C. Wilson, of Santa Fe, for cross-appellants, Charles Hepelsmith, et al.

The trustee's exercise of authority must be construed solely in light of deed of assignment.
2 Perry on Trusts, (6th Ed.) Sec. 602.

Trustee cannot profit by trust estate.

San Diego vs. San Diego & L. A. R. Co., 44 Cal. 113; Sargent v. Solberg, 22 Wis. 138; Claflin v. Farmers & C. Bank, 24 How. Pr. 1, 15; New York Cent. Ins. Co. v. National Prot. Ins. Co., 14 N. Y. 85, 91.

"If an assignment, not fraudulent, is made to a trustee for the benefit of creditors, their assent is not necessary; or their assent will be presumed in all cases, if it is for their benefit and contains no unusual clauses or restrictions."
Perry on Trusts, (6th Ed.) Sec. 593; Burrill on Assignments (6th Ed.) Sec. 90.

Furthermore, by assigning their claims to the Trustee, the creditors did become actual parties to the assignment.
Burrill on Assignments (6th Ed.) p. 129, and Sec. 428.

The same rule against secret preferences has been applied in England, and the United States, to cases of deeds of trust for the benefit of creditors ratably. And this rule has been applied to cases of the direct transfer of property to the creditor preferred.
Edrington v. Rogers, 15 Tex. 188; Hancock v. Horan, 15 Tex. 507.

Reed Holloman, of Santa Fe, for cross-appellant Francis C. Wilson.

The right of a debtor to make a common law assignment for benefit of creditors will be regarded as existing in each of the States of the Union unless shown to be expressly prohibited.

J. Walter Thompson v. Whitehead, 56 N. E. 1106, 185 Ill. 454, 76 Am. S. R. 51; Lucy v. Freeman, 101 N. W. 167, 92 Minn. 274; Fitzgerald v. Quann, 109 N. Y. 441, 17 N. E. 354.

The acceptance of the creditor under an assignment for the benefit of creditors is shown where he does any act which amounts to acquiescence therein.

Bodley v. Goodrich, 7 How. 276; Lacy v. Gunn. 144 Calif. 511; Royster v. Heck, 94 S. W. 8; Lionberger v. Broadway Sav. Bk., 10 Mo. App. 499; Vanderveer v. Conover, 16 N. J. L. 487; Wheeler v. Sumner, 29 Fed. Cas. 17501; Halsey v. Fairbanks, 11 Fed. Cas. 5964; Clark v. Gibboney, 5 Fed. Cas. 2821; Brown v. Minturn, 4 Fed. Cas. 2021; Lawrence v. Davis, 15 Fed. Cas. 8137; Brashear v. West, 7 Pet. 613; Tompkins v. Wheeler, 16 Pet. 106.

Creditor cannot hold assignment good in part and bad in part. If he comes in under it he must comply strictly with terms creditor has imposed.

Canavaugh v. Morrow, 67 How. p. 241; Swanson v. Tarkington, 7 Neisk. Tenn. 612; Ohio C. Co. v. People's Sav. Bk. 55 S. W. 765; Moody v. Templeman, 56 S. W. 588; Wilhoit v. Cunningham, 87 Cal. 453; Beifeld v. Martin, 37 Pac. 32; National Bank etc. v. Graham, 66 Pac. 684; Moffatt v. Ingham, 7 Dana. (Ky.) 485; Hewlett v. Cutler, 137 Mass. 285; Jewitt v. Woodward, 1 Edw. (N. Y.) 195; Burrill on Assignments, 6th Ed., 476-479; McLaughlin v. Park City Bank, 54 L. R. A. 343; Hatchett v. Blanton, 72 Ala. 423, 433; Adler Goldman Com. Co. v. Peoples Bank, 65 Ark. 380; O'Bryan v. Glenn, 91 Tenn. 106; Pratt v. Adams, 7 Paige, 615-641; Irwin v.

Tabb, 17 Serg. & R. 419; Frierson v. Branch, 30 Ark. 453; Kerslake, et al., v. Brower, etc., 66 Pac. 437; Watts v. Eufaula Nat'l. Bk., 76 Ala. 474; Wright v. Zeigler, 70 Ga. 561.

Rights of creditors, fixed in deed of assignment, can not be changed without consent of parties in interest.

5 C. J. 1149 and cases cited; 5 C. J. 1123, Sec. 151, and cases cited.

Assignor cannot reserve power of giving preferences, and cannot legally confer it upon assignee.

Boardman v. Halliday, 10 Paige, 223-228.

Court cannot modify terms of deed of assignment.

In the matter of Lewis, 81 N. Y. 421.

### STATEMENT OF FACTS

Prior to December 21, 1910, the Ramon Land & Lumber Company was in possession of the Ramon Vigil Grant under a contract to purchase the same from the owners. the terms of this contract not being disclosed by the record. The Ramon Land & Lumber Company had paid on account of the purchase price of the grant $20,000. and owed a balance of purchase money amounting to between $38,000 and $40,000 and had cut from the grant timber of a stumpage value of between $20,000 and $25,000. At that time. as was proven by subsequent events, the Ramon Land & Lumber Company was hopelessly insolvent, and, in addition to the unpaid purchase money, interest, and taxes on the grant, it was indebted to various creditors in a large amount. approximately $35,000.

Prior to the 21st day of December, 1910, a claim had been set up by the United States government that the northern boundary of the grant was not correctly located, and that the Ramon Land & Lumber Company had been cutting timber on government land. A large amount of ties and other timber was seized by representatives of the government, and it became known that a bond should be

given to the government to release the timber, and an agreement was entered into whereby H. B. Cartwright and Samuel G. Cartwright undertook to execute such bond, market the lumber, and hold the proceeds for their indemnity. The agreement was dated December 21, 1910, and provided that the Cartwirghts should execute the bond to the various parties for $3,500; that they should take possession of the ties and lumber and market the same and retain in their hands $3,500 of the proceeds as indemnity; that they should also retain $500, or such part thereof as they should advance for the purpose of paying taxes then due upon the grant; also, that they were to pay out of the proceeds realized from all ties from the merchandise advanced by them costs for the moving and shipping of said lumber; the remainder of the proceeds they were to turn over to the Ramon Land & Lumber Company, its trustees or assigns.

With these conditions recognized by all parties in interest, a scheme of reorganization was formulated, and, with a view to its consummation, Hanna & Wilson, as attorneys for the Ramon Land & Lumber Company, wrote a circular letter to the creditors of the Lumber Company, which is as follows, to-wit:

"Santa Fé, New Mexico, December 21, 1910.
"Gentlemen: Regarding your account with the Ramon Land & Lumber Company, this company, as you have doubtless surmised, is in severe financial straits. A reorganization, which we have under way and which we outline below, is the only hope or chance of saving the company from bankruptcy, in which event the unsecured creditors will not receive a dollar.

"The company has liabilities aggregating between $25,000 and $36,000, exclusive of the amounts due on the Ramon Vigil Grant, to which the company holds a contract title to be mentioned later.

"The cash assets (lumber, ties, etc.) amount to $6,500, which will lack $1,500 to $2,000 of paying prior' labor claims and cost of administration, i. e,: Cost of hauling the stuff to the siding; relieving an attachment of the U. S. Forestry Service, incidental to a boundary dispute; legal and clerical service.

"The personal property has been inventoried at $11,700 on the basis of a normal fair sale. In a receiver's hands, it would not bring this much. All of this, however, is covered by chattel mortgages, conditional sales, and liens. A small equity might possibly be secured through the liquidation of

the mortgages sufficient to cover the shortage in the cash assets necessary to pay up the prior labor claims. The company filed with its incorporation papers, at the time of its incorporation, a nonliability certificate which effectually eliminates the stockholders, even if they were financially resuonsible, which they are not. It is then obvious and apparent that in the event of bankruptcy the unsecured cerditors will receive nothing.

"The company holds the Ramon Vigil Grant, consisting of practically 32,000 acres of grazing, farming and formerly timber land, now practically cut over, under a contract by which the deed is in escrow in the bank and the company is obligated to make certain stipulated payments until the owners have been paid, down to $33,000, when the title will pass and a short term mortgage will be given and when still further reduced to $22,000 and a long time mortgage will be given.

"The contract provides the grant owners may declare forfeiture of title in case the stipulations of the contract are not lived up to. At no time during the life of the company have these stipulations been lived up to; consequently the grant owners could have and can now, at any time, forfeit the grant. The purchase price was $55,000, on which has been paid practically $20,000, including interest, leaving now due $38,000 to $40,000 subject to adjustment of sundry interest and other charges. A representative of the grant owners was here and seeing the actual condition of the company—which has been kept from them more or less—determined on the immediate forfeiture of the grant, which would, of course, have meant immediate bankruptcy for the company.

"At the earnest solicitation of some of the largest creditors here and ourselves, as the company's attorneys, he consented to the organization of a new company by the creditors, to take over the company's plant (held under mortgage by U. S. Bank & Trust Co.); and with it cut government timber, out of the profits of which to make certain payments to the grant owners, later pro rata payments to the creditors, but the entire arrangement mainly and principally to retain a hold on the grant, so that it may be sold, out of the proceeds of which to pay the grant owners and take the equity left over for the creditors and for the stockholders, should the proceeds go that far.

"Arrangements have been made for financing the reorganized company. It is the consensus of opinion that the grant might be sold for $3.00 per acre or nearly $96,000, which with personal property, would bring it up to $100,000, which would pay out all the creditors and even the stockholders; $2.50 per acre would pay out the creditors and all costs.

"The conditions of all these arrangements are:

"(1) That all the stockholders of the Ramon Land & Lumber Company turn in their stock and sign an agreement pooling their stock with the United States Bank & Trust Company, as trustee, practically an assignment of all their

H. B. Cartwright v. U. S. B. & T. Co., 23 N. M. 82.

rights of management, interest and title over to the aforesaid bank.

"(2)  Each and every one of the creditors must also pool their claims with the aforesaid bank, surrendering no right, but agreeing for three years to abide by the act of the bank as trustee and in no was trouble or harass the new company or the old company during the life of this trusteeship.

"A copy of this agreement is attached herewith for your signature.  There will be no costs or assessments against you, unless upon your own volition and upon our request, you should decide to assist in financing the new company or raising money to hold title to the grant.  We are glad to report that more than three-fourths of the stockholders have signed the pooling agreement.  It is now practically up to each individual creditor for the reason that one creditor can stop the entire arrangement.

"With your reply, please render a full itemized statement covering at least the last year that may be verified, and to which attach the inclosed assignment properly executed.

"In conclusion:  Time is the essence of this transaction. It is imperative for many reasons, too complicated and extended for the scope of a letter, that this deal go through at once, otherwise immediate bankruptcy is inevitable,' in which event, the unsecured creditors will not receive a cent and many secured creditors will not be fully protected.  We urge haste, but if you consider it positively necessary to secure additional information, we will be glad to furnish it. All the creditors here on the ground consider the plan practicable and feasible, and the only chance to protect themselves.  We had some doubt in regard to the stockholders, but we are confident all the directors will agree, because it is manifestly improbable that any creditor would so stand in the way of his best interests and only chance as to refuse, especially when he incurs no risk whatsoever.

"Trusting we will have your favorable reply by return mail, we are,                    Very truly yours,
                              "Hanna & Wilson, Attorneys.
    "Address replies to Harold S. Brooks, Santa Fé, N. M."

In pursuance of that scheme of reorganization, the required amount of stock in the Ramon Land & Lumber Company was transferred to the United States Bank & Trust Company, as trustee, and the voting trust agreement referred to in the letter signed, and claims against the lumber company aggregating some $21,894 were assigned to the United States Bank & Trust Company in anticipation of the consummation of the scheme of reorganization outlined in the letter of Hanna & Wilson.

On the 26th day of January, 1911, an agreement in writing was entered into between the Ramon Land & Lumber Company and the United States Bank & Trust Company as follows:

"Witnesseth: That for and in consideration of the sum of one dollar ($1.00) lawful money of the United States, paid to the party of the first part (Lumber Company) by the party of the second part (Trust Company), the receipt of which is hereby acknowledged, and other good and valuable considerations, and the covenants and agreements hereinafter expressed, the party of the first part hereby agrees to and does assign and transfer to the party of the second part, all the property, assets and equities of which the party of the first part may now be possessed, and does hereby invest the party of the second part with full power and authority to act for and in behalf of the said party of the first part in the place and stead of the party of the first part, as trustee for the party of the first part, but not otherwise, for a period of three years from the date hereof, for the purpose of marshaling the assets of the said party of the first part, and converting the same into cash, and in the proper distribution of the same among the creditors of said party of the first part, as hereinafter specified, and in the administration and management of the same as such trustee, as aforesaid.

"The party of the second part agrees to accept this trust and to administer the affairs of the first party in the winding up and closing out of its business, subject to the following agreements and conditions, to-wit:

"First. That the stockholders of the party of the first part, holding not less than ninety per cent. of the stock, shall sign a voting trust agreement, placing without condition the power to vote their stock in the hands of the United States Bank & Trust Company, the party of the second part, and making said voting trust agreement irrevocable for a period of three years from the date hereof.

"Second. The said party of the second part agrees to administer the affairs of the party of the first part for the interest of the stockholders and the creditors of said party of the first part, and to apply the net proceeds derived from the disposition of any and all of the assets of said party of the first part, as follows, to-wit:

"First. To the payment of labor liens which have already accrued, or may accrue against the party of the first part.

"Second. To the payment of the creditors of the first part by discharging the obligations due to the secured creditors first, and thereafter the obligations of the unsecured creditors, as hereinafter provided.

"Third. It is further agreed by and between the parties hereto, that all moneys derived from the disposition of the assets of the party of the first part, by the party of the second part, over and above the expenses of the management and disposition of the same, shall be distributed pro rata

amongst the different creditors after the payment of labor liens, when the net proceeds realized from the disposition of the property of the party of the first part shall equal the sum of $10,000; that is to say, when the net profits so realized shall have accumulated in the hands of the party of the second part to the amount of $10,000, then the party of the second part shall distribute pro rata the same amount amongst the creditors of the party of the first part, first paying the secured debts against the said party of the first part and the next $2,500 of net profits shall be paid to the attorneys as hereinafter provided, and thereafter no distribution shall be made until the net profits so realized as aforesaid, amount to a second $10,000, when a like pro rata distribution shall be made amongst all the creditors of the said party of the first part, and so on as herein provided, until all the obligations shall be discharged.

"Fourth. The said party of the second part further agrees, upon the payments, as aforesaid, of labor liens, and the claims of the secured and unsecured creditors, to pay to Hanna & Wilson and Winfield R. Smith, attorneys for the party of the first part, in consideration of services rendered, and to be rendered to the said party of the first part, the sum of $2,500 for each $10,000 worth of debts paid to the creditors of the party of the first part until the creditors are paid and satisfied, but no fee will be paid said attorneys until the payment of each $10,000 shall be made, that is to say, upon the payment of the first $10,000 the party of' the second part shall pay the next $2,500 of the net profits received, to the said attorneys, and upon the payment of the second $10,000 to the creditors, as aforesaid, the party of the second part shall pay to said attorneys the second $2,500 of the net profits received, and so on until the obligations of the said party of the first part are paid and satisfied.

"Fifth. It is further agreed and understood that if the party of the second part considers it best to obtain title to the grant, called Ramon Vigil Grant, in which the party of the first part has an equity of $20,000 to this date, in order to prevent the forfeiture of the grant by the owners of the said grant, under the terms of the contract between the owners of the said grant and the party of the first part, it shall have full authority to do so and to take the title of the said grant in its name as trustee, and to dispose of the same at any time within five months from date at not less than $3.00 per acre, and after that at not less than $2.00 per acre, and upon such terms as may be agreed upon between the party of the second part and the creditors of the party of the first part.

"Sixth. The said party of the second part agrees to render a report at the end of each three months from the date of the execution of this contract, as to the conditions of the affairs of the party of the first part, and concerning its duties as such trustee, and so on until this contract shall have expired by virtue of its conditions.

"Seventh. It is further agreed and understood by the party of the second part, that when the creditors are fully paid and discharged, and the conditions of this contract contained herein, are fully complied with, that it, the said party of the second part, will make over to the party of the first part, by proper conveyances, all the assets remaining in its hands as such trustee belonging to the party of the first part, and shall terminate this agreement and shall return to the individual stockholders the stock held by it under the voting trust agreement.

"Eighth. It is further agreed and understood by and between all the parties hereto, that the said party of the second part shall receive for its services as such trustee, in the marshaling of the assets and distribution of the proceeds arising from such trust, as provided herein, and under the voting trust agreement, the sum of six per cent. of all moneys disbursed by it under the provisions of this agreement.

"Ninth. It is further agreed and understood by all the parties hereto, that it, the said party of the second part, shall not contract any obligations or liabilities outside the duties of its trusteeship, and shall not assume any liabilities or obligations of any of the stockholders, or any of the creditors of the said party of the first part, outside of, or beyond its duties and liabilities as such trustee, for the purpose of collecting the assets, and disposing of the same in the best manner possible and accounting to the parties in interest for all moneys coming into its possession as such trustee, and the distribution of the same in accodance with the provisions of this contract ,that is to say, the sale of all the property, real, personal and mixed.

"It is further understood by and between all the parties hereto, that the conditions of this contract with respect to the real estate in which the party of the first part claims an equity, to-wit, the Ramon Vigil Grant, are made subject to any future contract which may be made between the owners of the said grant, and the party of the first part hereto, and the party of the second part hereto."

"It is further understood and agreed by and between all parties hereto, that this contract shall apply to and be binding upon the successors and assigns of the parties hereto."

On account of the objections of one Gaylord, a large stockholder in the Ramon Land & Lumber Company, to some of the terms of the contract last above set out, and especially that part of the contract relating to attorney's fees, the contract of January 26, 1911, was abandoned, and a new contract was entered into on the 16th of February, 1911, as follows:

"Witnesseth: That for and in consideration of the sum of one dollar ($1.00) lawful money of the United States paid

to the party of the first part by the party of the second part, the receipt of which is hereby acknowledged, and other good and valuable considerations, and the covenants and agreements hereinafter expressed, the party of the first part hereby agrees to and does assign and transfer to the party of the second part, all the property, assets and equities of which the party of the first part may be possessed, and does hereby invest the party of the second part with full power and authority to act for and in behalf of the party of the first part in the place and stead of the first party, as trustee for the party of the first part, but not otherwise, for a period of three years from the date hereof, for the purpose of marshaling the assets of the party of the first part, and converting the same into cash, and the proper distribution of the same among the creditors of the said party of the first part as hereinafter specified, and in the administration and management of the same as trustee, as aforesaid.

"That party of the second part agrees to accept this trust and to administer the affairs of the party of the first part, in the winding up and closing out of its business, subject to the following agreements and conditions, to-wit:       .

"First.    That the stockholders of the party of the first part, holding not less than ninety per cent. of the stock, shall sign a voting trust agreement, placing without condition the power to vote their stock in the name of the United States Bank & Trust Company, the party of the second part, and making said voting trust agreement irrevocable for a period of three years from the date hereof.

"Second.    The said party of the second part agrees to administer the affairs of the party of the first part for the interest of, the stockholders and creditors of the said party of the first part, and to apply the net proceeds derived from the disposition of any and all of the assets of the said party of the first part, as follows,. to-wit:

"First.    To the payment of labor liens which have accrued, or may accrue against said party of the first part.

"Second.    To the payment of the creditors of the party of the first part by discharging the obligations due to the secured creditors first, and thereafter the obligations of the unsecured creditors.

"Third.    It is further agreed and understood that if the party of the second part considers it best to obtain title to the grant called the Ramon Vigil Grant, in which the party of the first part has an equity of twenty thousand dollars ($20,000) to this date, in order to prevent the forfeiture of the grant by the owners of said grant, under the terms of the contract between the owners of said grant and the party of the first part, it shall have full authority to do so and to take the title of the said grant in its name as trustee, and to dispose of the same at any time within five months from date at not less than three dollars ($3.00) per acre, and during the period between five months from date and seven

months from date at not less than two dollars ($2.00) per acre and on such terms as may be agreed upon between the party of the second part and the creditors of the party of the first part.

"Fourth. The said party of the second part agrees to render a report at the end of each three months from the date of the execution of this contract as to the condition of the affairs of the party of the first part, and concerning its duties as such trustee and so on until this contract shall have expired by virtue of its conditions.

"Fifth. It is further agreed and understood by the party of the second part, that when the creditors are **fully paid** and discharged, and the conditions of this contract contained herein, are fully complied with, that it, the said party of the second part, will make over to the party of the first part by proper conveyance ,all the property and assets remaining in its hands as such trustee belonging to the party of the first part, and shall terminate this agreement and shall return to the individual stockholders the stock held by it under the voting trust agreement. Provided, however, if any claim should be in dispute or litigation, it shall not prevent said transfer of said property or assets, but the first party shall give a bond to the second party to protect it against said disputed claim.

"Sixth. It is further agreed and understood by and between all parties hereto, that the said party of the second part shall receive for its services as such trustee, in the marshaling of the assets and the distribution of the proceeds arising from such trust, as provided herein and under the voting trust agreement, the sum of six per cent. of all the moneys disbursed by it under the provisions of this agreement; provided, however, that if the trust should cease prior to a sale of the said Ramon Vigil Grant, the compensation of said trustee shall not exceed the sum of two thousand dollars ($2,000.00).

"Seventh. It is further agreed and understood by all the parties hereto, that it, the said party of the second part, shall not contract any obligations or liabilities outside of the duties of its trusteeship, and shall not assume any liabilities or obligations of any of the stockholders, or any of the creditors of the party of the first part, outside of or beyond its duties and liabilities as such trustee, for the purpose of collecting said assets, and disposing of the same in the best manner possible, and accounting to the parties in interest of all moneys coming into its hands as such trustee, and the distribution of the proceeds arising from the sale or sales of all the property of the party of the first part, coming into possession as such trustee, and the distribution of the same in accordance with the provisions of this contract; that is to say, the sale of all property, real, personal and mixed.

"It is further understood by and between all of the parties hereto, that the conditions of this contract with respect to the real estate in which the party of the first part claims

an equity, to-wit, the Ramon Vigil Grant, are made subject to any future contract which may be made between the owners of the said grant and the party of the first part, and the party of the second part hereto.

"Eighth: And it is further agreed that the second party, as such trustee, shall have the right to settle, adjust, or compromise all claims against the first party, and shall also have the right to take and accept claims against the first party in payment in whole or in part for the personal property held by it under this agreement, and at such discount as it may seem right and proper. And it is further agreed that the second party shall have full right to compromise, adjust or pay the claim of the United States Forestry Service against the first party, which claim is stated to be for the sum of thirty-five hundred dollars ($3,500). And it is further agreed that the second party shall have the right on the sale of the two sawmills (which are included in the property vested in the said second party by this agreement) to grant a right of way over the roads and bridges on the said Ramon Vigil Grant and the bridge over the Rio Grande river leading from the said grant to the Denver & Rio Grande Railroad Company's switch, at Buckman, New Mexico, and to provide that any sale of said grant shall be subject to said right of way upon the payment of the sum of forty dollars ($40.00) per month to the grantee thereof for the said right and privilege for each month said right and privilege is exercised, and not for any month said right and privilege is not exercised.

"Ninth. And it is agreed that said first party shall have the right to occupy the said Ramon Vigil Grant until the same shall be sold or said equity foreclosed, but without committing any material waste. And the said first party hereby confirms and ratifies all the acts of the second party which have been done or performed by it, heretofore and preliminary and under contemplation of the execution of this agreement.

"Tenth. It is further agreed between the parties hereto that in recognition of and as payment for the services of the firm of Hanna & Wilson, attorneys at law, for the parties of the first part, that the trustee shall pay to the said firm of Hanna & Wilson, the sum of ten thousand dollars ($10,000) if said grant is sold for three dollars ($3.00) an acre or more, or eight thousand dollars ($8,000) in case said grant shall be sold at two and 50-100 dollars ($2.50) per acre and up to three dollars ($3.00) an acre, or six thousand dollars ($6,000) in case said grant shall be sold for two dollars ($2.00) an acre and up to two and 50-100 dollars ($2.50) an acre; provided always, that in case the party of the first part or its assigns should settle its affairs with the grant owners and its creditors without the necessity of sellinig the grant, then and in that case the said firm of Hanna & Wilson shall be paid the sum of two thousand dollars ($2,000) in full discharge for the legal services of said firm.

"It is further agreed and understood by and between all the parties hereto, and that this contract shall apply to and be binding upon the successors and assigns of the parties hereto."

No creditor of the Ramon Land & Lumber Company participated in this transaction. The United States Bank & Trust Company, however, took possession of all the personal property of the Ramon Land & Lumber Company, placed Harold H. Brooks in charge thereof, and proceeded to liquidate the personal assets.

Before the 26th day of January, 1911, when the first so-called trust agreement was executed, it had become apparent that the scheme for using the sawmills of the Ramon Land & Lumber Company to cut timber on government lands and make a profit for the creditors was impracticable.

On the 18th day of March, 1911, the Ramon Land & Lumber Company executed a quitclaim deed to Smith and Stebbins, as trustees, for the Ramon Vigil Grant, and on the same day Smith and Stebbins, as trustees, executed and delivered to the United States Bank & Trust Company an option for the purchase of the grant. The option agreement recited the prior contract on the part of Smith and Stebbins to sell the said grant to the Ramon Land & Lumber Company for the sum of $55,000, and that there remained due under said contract the sum of $37,224.75. with interest thereon from July 8, 1910, and that the said Ramon Land & Lumber Company was in default on its contract, and that it had quitclaimed all its right, title, and interest in and to said grant to Smith and Stebbins, parties of the first part; and further recited that the Ramon Land & Lumber Company had entered into an agreement with the United States Bank & Trust Company, making said bank a trustee of the Ramon Land & Lumber Company for a period of three years for the purpose of marshaling the assets of said Ramon Land & Lumber Company, and converting the same into cash and distributing the same to the creditors of the Ramon Land & Lumber Company. The option contract given to the United States Bank & Trust Company required the bank to pay $4,224.75, with 7 per cent. interest on the entire amount. on or before July 1, 1911, and the remaining $33,000, with interest, on or before July 1, 1913. The agreement con-

tained other provisions not necessary to be incorporated in this statement of facts.

On the 28th day of June, 1911, two days before the expiration of the option, an arrangement was entered into between the United States Bank & Trust Company and H. B. Cartwright & Bro., whereby Cartwright & Bro. agreed to furnish the money to make the necessary payment (including money to pay taxes, etc.) A deed was made by Smith and Stebbins, trustees, to the United States Bank & Trust Company, as trustee for the Ramon Land & Lumber Company, conveying the Ramon Vigil Grant, which recited that it was executed in pursuance of the option last mentioned. On the same day and as a part of the same transaction the United States Bank & Trust Company executed a mortgage to Smith and Stebbins, as trustees, for the sum of $33,000, the balance provided for in the option contract, to secure the payment of the promissory note of even date therewith for said sum, due and payable two years after date, bearing interest at the rate of 7 per cent. per annum. The mortgage recited that it was made—

"between the United States Bank & Trust Company, a corporation of the city of Santa Fe, territory of New Mexico, as trustee for the Ramon Land & Lumber Company, a corporation, party of the first part, and Henry L. Smith, of Chicago, Illinois, and William C. Stebbins, of Watertown, New York, as trustees for the beneficial owners of real estate, hereinafter described, parties of the second part."

The real estate was described in the mortgage, and the note was set out in full. The note was signed, "United States Bank & Trust Company, Trustee, by N. B. Laughlin, President." The execution of the mortgage was acknowledged by the United States Bank & Trust Company.

H. B. Cartwright & Bro. at this time furnished the United States Bank & Trust Company something over $6,000 to pay the interest and taxes in arrears and the four thousand and two hundred odd dollars principal, and the United States Bank & Trust Company, as trustee, but not otherwise, executed to Cartwright & Bro. a promissory note for $19,689.80, and gave a second mortgage on

the Ramon Vigil Grant to secure the payment of said note. The court in paragraph 24 of its findings of fact, found that at the time Cartwright & Bro. advanced the money for the payment of interest, taxes, and principal, as aforesaid, the Ramon Vigil Land & Lumber Company was indebted to it in the sum of $12,925.42 for merchandise sold, and that it was agreed between the United States Bank & Trust Company, as trustee, and Cartwright that if the latter would furnish the money required for the payment of interest, taxes, etc., the trust company, as trustee, would give Cartwright & Bro. a second lien on the Ramon Vigil Grant to secure the money so advanced, and also its unsecured claim against the Ramon Land & Lumber Compnny.

Immediately after the United States Bank & Trust Company acquired title to the grant, under the option of March 18, 1911, the bank sought to find a purchaser of the grant, and options were given to divers persons: H. H. Brooks had an option for six months; Mr. J. H. B. Jones, of Albuquerque, endeavored to sell the grant; a man from Montana came to examine the grant and failed to take it; then two other men by the name of Merchant, from Nebraska, spent nearly a week on the grant and failed to purchase it; then Mr. Mayes, who was a director of the United States Bank & Trust Company, had an option, and he failed to make a sale; Mr. Stephens, cashier of the United States Bank & Trust Company, went out once or twice with men to examine the grant in an effort to sell it, and failed to make a sale. All of this was done with the knowledge and co-operation of H. B. Cartwright & Bro.

On March 26, 1913, Judge Laughlin, on behalf of the bank, wrote Cartwright, advising him that he would offer the grant for sale at $1.75 an acre.

Notwithstanding all these efforts to dispose of this property, there came a time when the United States Bank & Trust Company was in default to Smith and Stebbins in payment of the interest on the $33,000 note, taxes, etc., and this note was placed in the hands of Mr. Field, as attorney for Smith and Stebbins, for collection about July

H. B. Cartwright v. U. S. B. & T. Co., 23 N. M. 82.

1, 1913. The bank offered to convey the property to Smith and Stebbins in satisfaction of the note. The proposition was declined, and the bank was advised that it was the purpose of Smith and Stebbins to foreclose, sell the grant, and hold the bank for the deficiency. H. B. Cartwright & Bro., through H. B. Cartwright, thereupon intervened, and procured a two-year extension from the grant owners. The extension agreement was in writing, and was signed by Smith and Stebbins and the bank. In order to secure this extension agreement, H. B. Cartwright & Bro. paid $3,000 of the principal debt and all interest and taxes that were in arrear, indorsed the notes for interest during the extension period, and made a note for $2,500 to the bank for Mr. Field's fee, and the bank indorsed this note to Mr. Field. H. B. Cartrwight & Bro. also gave the bank the following indemnity agreement:

"Whereas, at the request of H. B. Cartwright & Bros., and H. B. Cartwright, the United States Bank & Trust Company has secured an extension of time of two years from the first day of July, 1913, for the final payment of the balance of the purchase money due for the purchase of the Ramon Vigil Grant to Henry L. Smith and Henry C. Stebbins, upon the condition and terms fully set forth and stated in the agreement of extension dated July 12, 1913, a copy of which is hereto attached, marked 'Exhibit A' and made a part hereof: Now, therefore, in consideration of such extension, the said H. B. Cartwright & Bros. and H. B. Cartwright, hereby agree and obligate themselves to pay all the moneys set forth in said agreement when the same shall become due and payable, and according to the tenor and effect thereof, and to save the said United States Bank & Trust Company as trustee, or otherwise, harmless from any such obligations, conditions and payments of money required by it to be paid in said Exhibit A as trustee or otherwise, and to assume and be liable to the said United States Bank & Trust Company, as trustee, for the full and faithful performance of all the conditions and obligations which it has agreed and bound itself to perform as such trustee, and to relieve it from any such responsibilities.

"In witness whereof, the parties hereto have hereunto set their hands this 12th day of July, 1913, at Santa Fe, New Mexico. Made and signed in duplicate.

                    "H. B. Cartright & Bros.
                    "H. B. Cartwright."

A meeting of the board of directors of the United States Bank & Trust Company was held, and approved the ac-

tion of the officers of the bank in arranging the extension of two years for the payment of the purchase price of the grant. The minutes set out in detail the foregoing action on the part of the bank and Smith and Stebbins and Cartwright.

On September 17, 1913, N. B. Laughlin, president of the United States Bank & Trust Company, on behalf of the same, wrote H. B. Cartwright & Bro. a letter in which he recited various attempts to sell the grant and the failure to do so and advising that it was his purpose to offer the grant for sale for $1.50 an acre. On the 25th day of October, 1913, the said Bank & Trust Company executed to appellant Frederick Muller an option for the sale of said grant, which option, after describing the land, provided that said Muller, his heirs or assigns, might purchase the grant on or before the 2d day of November, 1913, by paying to the bank, as trustee, the sum of $50,000 in cash. This option contract is set out in the record, and at the bottom thereof is a copy of the orignial acceptance of the terms and conditions of the same, signed by Mr. Muller. On the same day Mr. Muller executed to Ashley Pond an option on the grant, which provided that Mr. Pond might purchase the same by paying to the said Fred Muller the sum of $2.25 per acre in cash at any time on or before the 25th day of November, 1913, or the sum of $2.50 per acre, one-half of the purchase price in cash on or before the 25th day of November, 1913, the other one-half on or before two years from the date of sale, with interest at the rate of 6 per cent. per annum, on all deferred payments.

The evidence shows that at the time Muller obtained his option from the bank he had been over the ground with Pond, and that the option to Pond was executed immediately after the execution of the option to Muller by the bank. The evidence also shows that Pond himself was not able to buy the grant, and that his option was purely speculative, and that he had not, at the time he took the option, any purchaser in view, but took the option in the hope that he might be able to find persons whom he could interest in the grant. The option to Muller

was given by the president and cashier of the bank on verbal authority of the directors; no resolution with reference to it being passed at that time.

About the 14th day of November, 1913, John W. March, then Surveyor General of New Mexico, showed Judge Laughlin a telegram to the effect that some one was willing to give $55,000 for the grant, out of which March wanted a commission of $2,500. Judge Laughlin immediately called a meeting of the board of directors, notified Captain Muller and invited H. B. Cartwright to be present. The proceedings of that meeting are as follows:

"Santa Fe, November 14, 1913.
"A special meeting of the board of directors of the United States Bank & Trust Company, pursuant to call, was held at the banking rooms of said bank, and there were present N. B. Laughlin, president; W. E. Griffin, cashier; Fred Muller and John W. Mayes and R. H. Hanna, all directors and by invitation of the president of the board, H. B. Cartwright, president of the H. B. Cartwright & Bros. Co. Corporation, was also present.

"The president stated that the objects of the meeting were to discuss matters pertaining to the sale of the Ramon Vigil Grant by said U. S. Bank & Trust Company as trustee for the Ramon Land & Lumber Company, upon which said bank, as trustee, had on the 25th day of October, 1913, under authority and by direction of its board of directors, given an option for the sale of the same to Captain Fed Muller, or his assigns and the president stated that Mr. J. W. March of Santa Fe had shown him a telegram on that day, and had also shown the same to Mr. H. B. Cartwright, making a better offer for said grant than that under the option to said Muller, but no offer to pay any earnest money by Mr. March was made, and the board was called together to consider the two propositions, and 'to have Mr. Cartwright present as one of the creditors, and who had advanced a considerable amount of money in the payment on account of the purchase price of the said grant, and for taxes and to Mr. P. H. Loughren, of Washington, for legal services with respect to the contest brought by the Forestry Department with respect to the location of the north boundary line of said grant.

"Captain Muller then stated to the board that from present information he did not believe that the parties to whom he was selling would be able to take up the option by the 25th day of November, 1913, but that if the board would give an extension of time on his option, that he would pay $2,500 down on or before the 25th day of November, 1913, in compliance with his option, and would pay the same price purported to be offered by the parties represented by Mr. J. W. March; and stated further that he and his associates had al-

ready expended considerable money and time in preparing to sell said grant, and that he believed that he had the sale about ready to close if he could get an extension. Mr. Cartwright was then requested to state his views on the subject, and he said that so far as he was concerned he was satisfied with the proposition made by Captain Muller; that while he thought the grant was worth a good deal more than the price offered, he believed that under the circumstances that it was the best price and the best offer that had been made for said grant, whereupon,

"On motion made by Mr. Mayes, seconded by Mr. Griffin, the board authorized and directed the president and cashier of the said U. S. Bank & Trust Company, as trustee, to enter into a contract for the sale of said grant with Captain Fred Muller and his associates, upon the conditions and terms stated by him, which motion was unanimously carried by the board on a vote put on the motion.

"There being no further business, the board adjourned, subject to the call of the President.

"(Signed)    N. B. Laughlin, President.
                     "Fred Muller,
                     "R. H. Hanna,
                     "John W. Mayes.
"Attest:    W. E. Griffin, Cashier."

On the 15th day of November, 1913, an extension of the option to Capt. Muller was granted by the bank, which provided for the payment of $53,500; $2,500 on or before the 25th day of November, 1913; $32,500 on or before December 25, 1913; the balance of $23,500 to be paid on or before the 25th day of November, 1916, with interest at the rate of 6 per cent. per annum. It was further provided that if the said Muller failed to carry out his option, the said $2,500 should be forfeited as liquidated damages. In pursuance of the extension of the option, Muller, on the 21st day of November, 1913, paid $2,500; on the 25th day of December, $2,500 more was paid. Each of these sums was paid by Ashley Pond to the bank on account of Muller's option and at Muller's request. On the 26th day of December, 1913, a further extension of time was granted Muller by the bank within which to complete the payments under the option granted him; and again on the 28th day of February, 1914, when it became evident that the United States Bank & Trust Company could not complete its title so as to convey its estate in fee simple under general warranty, a further extension

of time was granted Capt. Muller until the 15th day of April, 1914.

The controversy with the United States with reference to the northern boundary of the grant involved a large part of the grant, approximately 10,000 acres. H. B. Cartwright & Bro. wired Judge Hanna, in Washington, to take the matter up, and as a result of that action a lawyer in Washington, Patrick H. Loughren, was employed by Cartwright & Bro., and after a long delay, and about the middle of December, 1913, he succeeded in establishing the northern boundary as claimed by the owners. Cartwright & Bro. paid his retainer of $250, and he was paid an additional $1,000 out of the proceeds of the sale of the grant. There was considerable delay in making out the title to the satisfaction of Mr. Pond's associates, all of which is fully set forth and explained in the correspondence offered in evidence. When the bank was finally ready to make the title, and Pond and his associates were ready to receive it, it was arranged that they should pay $20,000 in cash and give their promissory notes, dated the 30th day of March, 1914, payable one, two, and three years from date, respectively, with interest at 6 per cent. per annum, payable semi-annually, secured by first mortgage on the Ramon Vigil Grant. It was also provided that Pond and his associates should have the privilege of forming a corporation, authorized to do business in New Mexico, and convey the grant to this corporation, and that it should give its corporate notes, of like tenor and effect and similarly secured, in lieu of the three individual notes for $20,000 theretofore given, and that thereupon the individual liability of the purchasers should cease.

There were two meetings of the board of directors of the United States Bank & Trust Company in reference to the consummation of the sale under the Muller option, said meetings having been held on June 1 and 3, 1914, approving the action of the bank in making the sale and the terms of the same, and authorizing the conveyance. Conveyance was made by the bank direct to Pond and his associates at the request of Pond and Muller and because

the option to Muller required the bank to convey to Muller's assigns. The bank assisted Muller to borrow $15,000 from the Santa Fé Bank & Trust Company, putting up the $60,000 of notes as collateral security; and, with the $20,000 paid in cash by Pond and his associates and the $15,000 borrowed from the Santa Fé Bank & Trust Company, the balance of the purchase money due on the grant, with all interest, was paid, and the attroney's fees, taxes, etc., were paid off and discharged.

None of the directors ever asked Muller about the price at which he was disposing of the grant, nor did· H. B. Cartwright, or any one else, ever ask Muller what price he was to have for the grant, or what profit, if any, he was to make.

On the 31st day of March, 1914, H. B. Cartwright & Bro. with full knowledge of the fact that the trustee was to receive $53,500 as the full purchase price of the grant, released its second mortgage, which was immediately recorded in Santa Fé county. The purpose and intention of all the parties was that this release was to be executed for the purpose of enabling the bank to close the deal and make a satisfactory conveyance, which could not be done until the lien of the second mortgage was discharged. Shortly after the closing up of the transaction, H. :B. Cartwright & Bro. demanded of the bank that it turn over to it one of the notes for $20,000, and, upon refusal of the bank to do so, brought this suit. Ballard & Armstrong, of Roswell, N. M., were the people who opened the negotiations with Pond for the sale of the grant and were interested with Muller in his option. The directors of the bank knew that Muller had other people associated with him in the transaction, that he had expended time and money in an effort to sell the grant, and that he expected to make a profit out of it.

The plaintiffs, by their original complaint, challenged the validity of the sale and the authority of the bank to make it; they made Pond and his associates parties defendant, and procured an injunction to prevent the bank from substituting notes of the Pajarito Land Company, the corporation formed to take over the grant, for the

individual notes of Pond and his associates. But when
H. B. Cartwright & Bro. ascertained that Pond and his
associates were in a mood to repudiate the transaction and
demand a refund of their money, they dismissed the case
as to Pond and his associates and abandoned their in-
junction. A supplemental complaint was filed before the
trial, wherein Cartwright & Bro. sought to enjoin the bank
from enforcing the collection of the two notes, one for
$2,000 and the other for $3,000, which had been given to
the bank by Cartwright & Bro. for part of the money which
was paid to Smith and Stebbins. The supplemental com-
plaint was stricken out and the injunction dissolved, but
a motion for rehearing was interposed by H. B. Cartwright
& Bro. and had been under submission for several months
when the bank and Muller agreed to a trial under a
stipulation which is set out in the record as follows:

### "Stipulation in Open Court.

"Mr. Field: It has been agreed by all the attorneys repre-
senting all the parties to this record, who are represented by
attorneys, that the demurrers interposed by the United States
Bank & Trust Company, and other defendants to the amended
complaint and petition in intervention shall be withdrawn;
that such evidence as is thought to be material may be of-
feerd by each party to the record, subject finally to its admis-
sibility and relevancy to the issues as finally made up; that
when all the evidence is taken in behalf of all the parties to
the record who desire to offer evidence, the plaintiffs and
interveners shall have leave to make any amendments to their
pleadings which, in their opinions, may be necessary to prop-
erly present the issues which they wish to present, and that
the defendants represented by me shall then have leave to
plead issuably to those pleadings as amended. If no amend-
ments are made, then the defendants represented by me are
to have leave to plead issuably as they may be advised to the
pleadings as they stand. In taking the testimony in this way
no objection to the admissibility of evidence or waiver of
rules of evidence is involved. This stipulation is intended to
cover all pleadings and to leave all parties to the record at
liberty to reframe pleadings, after the evidence is in, in any
way they may deem necessary or advisable, and then the de-
fendants represented by me will be left free to plead in what-
ever form they may be advised."

Pursuant to the stipulation trial was had, and the court
made findings of fact and upon which conclusions of law
were stated. The sixteenth, seventeenth, eighteenth,

twenty-eighth, twenty-ninth, and thirty-second findings of fact were as follows:

"(16) That at the time of obtaining option and each of several renewals thereof, said Frederick Muller had entered into a contract for the sale of said grant for the sum of $80,000.

"(17) That at the time of obtaining said option, and each renewal thereof, said Frederick Muller failed to disclose to the United States Bank & Trust Company, trustee, or to any other persons, the fact that he had a contract to sell said grant for the sum of $80,000, or for any other sum whatever.

"(18) That said Frederick Muller failed to disclose said fact for the reason that he desired to prevent said United States Bank & Trust Company, trustee, and all other persons, from ascertaining the fact that he had a contract to sell said grant at the sum of $80,000, and desired to make a profit for himself and associates of the difference between $53,500 and $80,000."

"(28) That on the 25th day of October, 1913, the United States Bank & Trust Company, trustee, gave to the defendant Frederick Muller an option to purchase the Ramon Vigil Grant at the price of $51,000, and subsequently, in the month of November, 1913, extended said option with the consent of H. B. Cartwright & Bros., but that at the time of granting said option, and at all times subsequent neither the fellow directors, individually, of said Frederick Muller, nor the board of directors of the United States Bank & Trust Company, knew, nor did H. B. Cartwright & Bros. know, that Frederick Muller in taking said option and endeavoring to negotiate the sale of said Ramon Vigil grant and had negotiated a sale of the said grant for the sum of $80,000, and the said Frederick Muller concealed from them such knowledge.

"(29) That at the time of the first extension of the said option to Frederick Muller, the price at which he was to be priviledged to purchase the said grant, originally $51,000, was increased to $53,500, because one John March made an effort to sell said grant at the sum of $53,500, but demanded a commission of $2,500 for making such proposed sale, and the said Frederick Muller then and there failed to disclose the fact that he was negotiating the sale of the said grant for the sum of $80,000, and at said time, the said Frederick Muller was a member of the board of directors of the said United States Bank & Trust Company, as trustee."

"(32) That Frederick Muller concealed and failed to disclose to the United States Bank & Trust Company, trustee, and to H. B. Cartwright & Bros. the fact that he was negotiating, and had negotiated, a sale of the Ramon Vigil Grant for the sum of $80,000, and that the interference at least was allowed to stand that he was not profiting from the sale of said grant under his option; that the United States Bank & Trust Company, trustee, and its directors, H. B. Cartwright & Bros. were entitled to know all of the facts in connection with the sale of said grant negotiated by him."

The court also found that the claim of Hanna & Wilson, for attorney's fee, which had been assigned to Francis C. Wilson, was not entitled to a preference. On the findings so made judgment was entered against Frederick Muller denying him any right to a commission or compensation for the sale of said grant, awarding the United States Bank & Trust Company, as trustee, a commission only upon the $53,500, and refusing it any commission as to the amount claimed by Capt. Muller. Judgment was entered, decreeing that Cartwright & Bro. was entitled to a preference for the full amount of its claim as expressed in the mortgage heretofore referred to, and distributing the surplus to the general creditors pro rata in proportion to their claims. From this judgment, Frederick Muller and the United States Bank & Trust Company appeal. An appeal is also prosecuted by Francis C. Wilson and by Charles Haspelmath, et al., general creditors.

## OPINION OF THE COURT.

ROBERTS, J. (after stating the facts as above). There are three separate appeals from the judgment entered in this case, and all will be considered in the same opinion. Muller and the United States Bank & Trust Company join in one appeal. Muller seeks a reversal of the judgment, in so far as it denies him the right to the excess sale price over $53,500. The bank contends that the court erred in denying it a commission on such excess sale price, in the event such excess constitutes a part of the trust estate, and that error was also committed in not allowing it its attorney's fee. Francis C. Wilson seeks a reversal of the judgment, in so far as it denies him a preference as to the attorney's fee due Hanna & Wilson, under the so-called trust agreement; while Haspelmath and other general creditors assign error upon the action of the court in awarding Cartwright & Bro. a preference.

First, we will consider and determine the nature of the so-called trust agreement or contract dated February 16, 1911, as the rights of the parties all arise under it. The general creditors, joining with Haspelmath, contend that it was an assignment for the benefit of the creditors.

Cartwright & Bro. in their complaint allege that it was an assignment for the benefit of creditors, while Muller and the bank say it was not such, but that under the terms and provisions of the agreement the Ramon Land & Lumber Company merely empowered the bank, as its trustee, to transact its business for three years. While, as stated, Cartwright & Bro. in their complaint characterize the contract as an assignment for the benefit of creditors, in its brief filed here and in the oral argument its counsel fail to take a definite position in this regard. Whether the first trust agreement, dated January 26, 1911, was ever delivered does not appear from the record. The president of the trustee bank says he does not know whether the bank act under it, or the later agreement of February 16th. The trial court found:

"That the Ramon Land & Lumber Company and all of the creditors, parties to this action, acted upon said deed of assignment executed on February 16, 1911, as the instrument which empowered said United States Bank & Trust Company to act as trustee in said matter."

We believe the evidence warranted this finding, or, to say the least, a finding that the parties acted under the second trust agreement, notwithstanding the statement of Judge Laughlin to the effect that he did not know under which trust agreement the bank was acting.

That the second trust agreement was delivered to the bank and accepted by it is not disputed. Cartwright & Bro. and the general creditors all concede that their rights are governed by the agreement of February 16th; and, as will be later shown, in so far as the rights of Muller are concerned, it would be wholly immaterial under which agreement the trust was being administered.

That neither trust agreement constituted a legal and valid deed of assignment for the benefit of creditors, either at common law or under the statute (chapter 7, Code 1915) is not subject to question.

[1-3] That it was the intention of the creator of the trust, the Ramon Land & Lumber Copmany, to create a trust in favor of its creditors is likewise clearly evident

from the terms of the trust agreement, when construed in the light of the surrounding facts and circumstances.

"There should be a proper regard for the object which the parties had in entering into the contract, as well as the language employed in arriving at its proper construction. Inquiry may be made as to their situation at the time the contract was entered into, and the purpose to be accomplished by its execution. Thus, where the defendant was given the right to sell a certain commodity within the state of Illinois on the payment of a royalty to the plaintiff for goods sold in such state, the former could not avoid payment of the royalty by making the contract of sale in another jurisdiction with knowledge that the goods were to be used in Illinois. Previous and contemporary transactions and facts may be taken into consideration to ascertain the subject matter and the sense in which the parties have used particular terms, but not to modify the plain language. It is proper to look at all surrounding circumstances and the pre-existing relation between the parties, and then to see what they mean when they speak." Elliott on Contracts, § 1519.

It is true both contracts in question state that the United States Bank & Trust Company was invested with certain powers "as trustee for the party of the first part, but not otherwise." But when the agreements are viewed in the light of circumstances surrounding their execution, and the object sought to be accomplishesd, we think it is clear that it was the intention of the Ramon Land & Lumber Company to create a trust for the benefit of its creditors. Prior to the execution of either agreement it found itself unable to pay its debts, and its equity in the Ramon Vigil Grant subject to forfeiture. It was also involved in litigation with the United States government, relative to the boundary line of the grant. Such being its status, in the late fall of 1910, its attorneys, Messrs. Hanna & Wilson, sent to all its creditors the letter set out in the statement of facts. Attached to such letter was a copy of the proposed trust agreement, which is dated January 26, 1911. In response to this letter, many of the creditors filed their claims with the United States Bank & Trust Company.

The object sought to be accomplished by the creator of the trust was: First, to pay its creditors; and, second, to secure for its stockholders any surplus that might remain after such creditors were paid.

Appellant Muller contends that the instruments in question were mere powers of attorney, by which the Ramon Land & Lumber Company constitute the United States Bank & Trust Company its attorneys in fact to do the various things which it was directed to do. In Perry on Trusts, § 589, the author says:

"No formalities are required in an assignment in trust for creditors, if the instrument is so constructed that the intention of the parties can be inferred from it."

In the case of Watson v. Bagaley, 12 Pa. 164, 51 Am. Dec. 595, it was held that a power of attorney to collect certain moneys and pay them to certain creditors, in a prescribed order of preference, was virtually an assignment.

"There is no particular formality required or necessary in the creation of a trust. All that is required is written evidence supplying every essential detail of the trust.   *   *   * Any agreement or contract in writing, made by a person having the power of disposal over property, whereby such person agrees or directs that a particular parcel of property of a certain fund shall be held or dealt with in a particular manner for the benefit of another, in a court of equity raises a trust in favor of such other person against the person making such agreement, or any other person claiming under him voluntarily or with notice." Perry on Trusts, § 82.

The agreements in question clearly show that it was the intention of the Ramon Land & Lumber Company to create a trust in favor of its creditors. It invested the trustee, the United States Bank & Trust Company, with the legal title to its property, of every kind and character, and directed it to convert the same into cash and to distribute the same among its creditors. It is true the trust was limited in its existence to the period of three years from the date of the contract, but this we do not regard as material.

It is argued on behalf of Muller that it was contemplated by the parties that the Ramon Vigil Grant might be eliminated from the operation of the agreements whenever the exigencies of the situation required it, and that this was subsequently done. Both agreements contained the following provision:

"It is further understood by and between all the parties ʰereto that the conditions of this contract with respect to the real estate in which the party of the first part claims an equity, to wit, the Ramon Vigil Grant, are made subject to any future contract which may be made between the owners of the said grant and the party of the first part, and the party of the second part hereto."

As shown in the statement of facts, the Ramon Land & Lumber Company had only an equity in this grant, under an option contract to purchase the same, which was subject to forfeiture at any time. After the trust agreement was signed, on, to-wit, the 18th day of March, 1911, the Ramon Land & Lumber Company quitclaimed all its interest in the grant to Smith and Stebbins, and on the same day Smith and Stebbins executed to the United States Bank & Trust Company, as trustee, an option contract, under which the bank, as trustee, was given the right to purchase the grant on or before July 1st following, for a stipulated price. The option contract and various transactions are set out in the statement of facts, and need not be here repeated.

Muller contends, as stated, that the trust agreement gave the parties the right to take the Ramon Vigil Grant out from under its terms, and make any new arrnagement in regard thereto that they might deem advantageous, which was done by the parties, and that thereby the creditors were divested of all rights and equities therein. The fallacy of this argument, assuming that the trust agreement conferred such power upon the parties, lies in the fact that there is no evidence in the record of any such intent by the parties. The bank accepted the option contract from Smith and Stebbins and apparently proceeded with the administration of the trust as though such Ramon Vigil Grant was included within the terms and stipulations of the trust agreement under which it was operating. We think the record shows that all that the parties did, or intended to do, was to release the old option under which the Ramon Land & Lumber Company had operated, and to give to the bank, as trustee, a new option, which definitely expired on a given date. In other words, the old option having expired, the owners of the grant

gave to the bank, as trustee, a new option, for a definite time, in order that it might proceed in the premises with the certainty that if it should find a purchaser in the meantime, or be able to finance the company, it would not be cut off in its right to demand a deed from the owners of the grant. After the consummation of the transaction the record shows that the bank regarded itself as a trustee for all of the creditors, not only in regard to the personal property owned by the corporation at the time the trust deed was executed, but likewise the Ramon Vigil Grant. After the grant had been sold, it sent out a statement to all of the creditors, showing its receipts and disbursements, in which it charged itself with $53,500, which it claimed was the sale price of the grant.

It is true it executed a second mortgage to Cartwright & Bro. for certain moneys advanced by them and likewise for its unsecured claim, but Judge Laughlin testifies that at the time he told one of the Cartwrights that he did not think the bank had the right to give it a preference, thereby clearly indicating that, as president of the trustee bank, he regarded the land grant as a part of the trust estate, subject to the terms and conditions of the trust agreement.

. The fact, if such be true, that the Ramon Land & Lumber Company did not, at the time of the creation of the trust, convey to the trustee bank such title as it had to the Ramon Vigil Grant, but reserved unto itself, in conjunction with the trustee and the owners of the grant the right to make a new and further agreement relative thereto, would not take such land out from under the terms of the trust agreement, if it be a fact that thereafter the creator of the trust caused the legal title to be vested in the trustee, with the intention that it should be governed and controlled and be subject to the terms of the instrument creating the trust.

"The fact that the creator of a trust does not transfer to the trustee the legal estate in the trust property, which he subsequently gets in is immaterial." The Laws of England. Trusts and Trustees, § 33.

When the clause above referred to is considered, in the light of the situation of the parties at the time the trust agreement was executed, we believe it is apparent that all that was intended by such provision was that if it became necessary, in order to preserve the equity of the creator of the trust in and to the Ramon Vigil Grant, the parties were to be left free to make any arrangement that might become necessary in regard thereto. The equity of the creator of the trust was subject to forfeiture at the time the trust was created. Neither the bank nor the Ramon Land & Lubmer Company knew what terms or conditions the owners of the grant might exact in order to grant further time; hence they desired to be left free to deal with such matter to the best advantage. It is clear that it was not the intention of the parties, by the new arrangement made relative to this real estate, by which the Ramon Land & Lumber Company quitclaimed to Smith and Stebbins and they gave to the bank an option to purchase, to take this real estate out from under the terms and provisions of the trust agreement. The new arrangement was made with a view to preserve the equity in the land grant, and to give the trustee further time 'within which to arrange for the sale of the grant, or to secure the money to preserve the equity. That the creator of the trust so regarded the matter is evident, for certainly it was cognizant of the fact that the trustee was so treating it, and no objection was raised on its part, or attempt made to call the trustee to account.

"The creation of a trust requires no prescribed form of words, and any expression which evinces the settlor's present intention to place his beneficial interest in specified property absolutely beyond his control, for the benefit of some person or object, is enough, and even precatory words, if as a whole the intention appears that they are intended as imperative, will create a valid trust." 28 Am. & Eng. Ency. Law, 866."

Assuming, for the sake of argument, that the above provision gave to the Ramon Land & Lumber Company, in conjunction with Smith and Stebbins and the bank the power to withdraw the real estate from the operation of the trust agreement, certainly when it caused the option to

be executed to the bank, which later took the legal title, as trustee, the Ramon Land & Lumber Company placed its interest in the property beyond its control, and definitely establishesd the real estate as a part of the trust estate. To say the least, all the parties so regarded it, and, where a corporation trustee acts upon the assumption that certain real estate is a part of the trust estate, a director of such corporation will not be heard to say that it was not, in order that he may retain a profit made in dealing with such property. And while the trusteeship was limited in duration for the period of three years, still during that time the beneficial interest in the property was absolutely beyond the control of the creator of the trust, and, where a trustee has converted the trust estate into money, within the time limited, and is proposing to distribute the same to the beneficiaries of the trust, a director of such corporation trustee cannot be heard to question the validity of the trust, nor will the trust agreement at his instance be given a construction different from that acted upon by the trustee and the parties to the agreement.

[4, 5] It is argued that the creditors did not accept the trust agreement of February 16, 1911; that they had no notification that the original plan had been abandoned, and the new agreement consummated. This insistence is answered by the rule of law, that:

"The acceptance by the beneficiary of a trust in his favor is presumed, until he rejects it." 28 Am. & Eng. Ency. of Law, 895.

The fact that the instrument in question was invalid as an assignment for the benefit of the creditors, and might have been attacked by any of the creditors, does not aid Muller. The bank, of which Muller was a director, accepted the trusteeship and proceeded to administer the trust; hence Muller is in no position to question the validity of the trust agreement, or to question the right of the creditors to call him to account, if as a director he has violated his duty in dealing with the trust property.

Appellant Muller contends that the so-called trust agreements were mere powers of attorney, by which the bank

was to act as attorney in fact for the Ramon Land & Lumber Company in converting its assets into cash and distributing the proceeds among its creditors.

"A trust, in the modern and confined sense of the word, is a confidence reposed in a person with respect to property, of which he has possession or over which he can exercise a power to the intent that he may hold the property or exercise the power for the benefit of some other person, or object." The Laws of England, vol. 28, Trusts, p. 5.

Here the bank, as trustee, was invested with the legal title to the property, and it was directed to dispose of the same and to apply the proceeds of the payment of the claims of the creditors of the Ramon Land & Lumber Company in a specified manner. These creditors, under the terms of the instrument, were the beneficiaris of the trust, and no power was reserved in the creator of the trust to change its directions so given, or to alter, change, or modify the terms and conditions of the agreement, provided the trust was executed within the time limited, viz., within three years. The land was sold within the specified time, and the interests of the beneficiaries became fixed and irrevocable.

Although, as stated, the trust agreement, treated as an assignment for the benefit of the creditors would have been invalid and subject to be set aside by any creditor, not accepting its provisions, Muller is in no position to set up the invalidity of the trust agreement, or to otherwise attack it, when, as stated, the corporation of which he was a director treated it as a valid and binding trust, for the benefit of the creditors of the creator of the trust.

Treating the agreement as establishing the relation of trustee and *cestui que trustents,* as between the bank and the creditors of the Ramon Land & Lumber Company, we will proceed to consider the questions presented by Muller.

[**6, 7**] First, it is contended, that a director is under no disability to contract with the corporation of which he is such, provided he acts fairly and deals at arm's length with his fellow directors. Here, all parties concede there was no intentional fraud on the part of either Muller or the bank. Muller, as a director knew of the repeated ef-

forts made to sell the grant; the price at which it had been offered, and all the facts relative thereto. He had taken the proposed purchaser over the grant, and while he did not know that he would purchase it, he knew that if a deal should be consummated, the purchaser would pay $80,000 for it. With this knowledge, he obtained an option for the grant for $50,000, which was subsequently increased to $53,500. He says that he purposely refrained from telling his fellow directors about these negotiations with Pond, for fear that they might want more for the grant. No one asked him as to the price for which he was expecting to sell the grant. He knew that other directors had at various times options on the grant. He supposed that he had a right to contract with his fellow directors in regard thereto, and apparently no one of the other directors was cognizant of the fact that they could not lawfully make such a contract with a fellow director.

The present case presents a unique proposition, in that it not only involves the trust relations between a director and the corporation which he represents, but it presents the further question of his dealing with property held in trust by the corporation for the benefit of third parties. There are some cases which seemingly imply that a director may deal at arm's length, relative to corporate property and interests, with his fellow directors, notwithstanding the fact that he occupies a trust relation of the highest character toward the corporation which he represents, or, perhaps, more definitely stated, toward the stockholders of the corporation. We think, however, that under such circumstances, nothing but the utmost good faith on his part, supplemented by a full and fair disclosure in advance, to his fellow directors, will satisfy the requirements of the law and enable him to retain a profit made at the expense of the corporation. Appellant Muller cites the following cases: Richardson v. Green, 133 U. S. 30, 10 Sup. Ct. 280, 33 L. Ed. 516; Ft. Payne Rolling Mill Co. v. Hill, 174 Mass. 224, 54 N. E. 532; Barnes v. Spencer & Barnes Co., 162 Mich. 509, 127 N. W. 752, 139 Am. St. Rep. 587; Figge v. Bergenthal, 130 Wis. 594, 109 N. W. 581, 110 N. W. 798; Cowell v. McMillin,

177 Fed. 25, 100 C. C. A. 443; Huffaker v. Germania Safety Vault & Trust Co., 107 Ky. 200, 53 S. W. 288, 46 L. R. A. 384. A careful reading of these cases will show, we believe, that they do not go to the extent claimed by the appellant. The true rule in this regard is stated by Mr. Thompson in his work on Corporations (6th Ed.) § 1223, as follows:

"The law prohibits a trustee from speculating in the subject-matter of his trust; and, while a purchase by a director of the corporate assets may not be entirely void as to creditors, he will not be permitted to reap a benefit to their detriment by dealing in such assets as a third party. If, therefore, he does purchase corporate assets, he must account to those who have the right to demand it for the full value of the property so purchased. 'No principle in the law of corporations,' say recent writers on corporation law, 'is founded on sounder reasons, or more surely settled, than the principle that the directors, trustees, or other officers of a coration, who are intrusted with its interests, and occupy a fiduciary relation to it, will not be allowed to contract with the corporation, directly or indirectly, or to sell property to it or purchase property from it, where they act both for the corporation and for themselves. In such a case, the transaction is, at the very least, voidable at the option of the corporation; and it may be avoided and set aside, or affirmed and any profits recovered, without proof of actual fraud or of actual injury to the corporation.' This rule requiring fidelity of action is not limited to directors expressly, but extends to other members of the corporation who assume to act in a fiduciary character for it. Hence the general rule applicable alike to directors and other members may be stated thus: A member of a corporation, acting in its behalf, either as a director or a member of a committee, to purchase or sell property, assumes towards the corporation relations of a confidential and fiduciary character; and by accepting such an appointment with its implied duties he becomes intrusted with powers, and charged with duties, to be exercised and performed for the common interests of the corporation and stockholders, and not for his own private interests or profit. In purchasing or selling property he cannot reserve a benefit or reap any profit to himself or a firm with which he may be connected without an abuse of the trust and confidence reposed in him by the corporation. The law will enforce fidelity on the part of a person who acts for others, by imposing upon him a disability, either partial or complete, to deal in his own behalf or for his own private interests or profit in respect to a matter involving such trust or confidence."

That a director is not wholly precluded from dealing with corporations which he represents is shown by the next

succeeding section (1224), but requires of him, when so
dealing, to make a full and fair disclosure to the other
directors of all the circumstances attending the proposed
transaction and the extent of the benefit which he will
receive thereby.   The author says:

> "The rules given with reference to a director dealing with
> the corporation, or with himself, and requiring him to ac-
> count for secret profits, do not mean that a trustee is abso-
> lutely prohibited either from dealing with the corporation or
> from making a profit out of his trust relation.   The princi-
> ples announced are intended to prevent directors from mak-
> ing a secret profit in transactions between themselves and
> the corporation.   They do not impose upon the director an
> absolute duty to avoid, wholly, the doing of anything for his
> own benefit; but his obligation to the beneficiaries in the
> trust is to make full, fair, and complete disclosure of all the
> circumstances attending any transaction which will benefit
> himself in any manner different from the manner in which
> all the shareholders will be benefited."

We do not believe that a director can deal at arm's length
with his fellow directors in regard to the corporate prop-
erty or corporate interests.   The position of confidence
which he has held has enabled him to obtain an intimate
knowledge of the affairs of the corporation and to exer-
cise influence with those associated with him in the man-
agement.   If the other directors of the corporation are
disinterested, the director can, we think, deal with them
as any other trustee can deal with the cestui que trust, and
his contract will be upheld, provided he makes a full dis-
closure of all the facts known to him about the subject and
takes no advantage of his position and deals honestly and
openly and concludes a contract fair and beneficial to the
corporation.  .See, also, Cook on Corporations, § 653 and
authorities cited.   Other authorities to the same effect cited
by appellee are as follows:   Perry on Trusts (6th Ed.)
§§ 206, 430; Pomeroy's Eq. Jur. §§958, 1077; Magee on
Banks and Banking (2d. Ed.) § 103; 5 C. J. 1224; 10
Cyc. 799; Gay v. Young Men's Consol. Co-op. Merc. Inst.,
37 Utah, 280, 107 Pac. 237; Purchase v. Atl. Safety Dep.
& Trust Co., 81 N. J. Eq. 344.87 Atl. 444; Newcomb v.
Brooks, 16 W. Va., 32, 58-94; Greenville Gas Co., v. Reis
et al., 54 Ohio St. 549, 44 N. E. 271; Tenison v. Patton,

59 Tex. 284, 67 S. W. 92; McCord v. Nabours, 101 Tex.
494, 109 S. W. 913, 111 S. W. 144; Jenkins v. Hammer-
schlag, 38 App. Div. 209, 56 N. Y. Supp. 534; Stanley
v. Luse, 36 Or. 25, 58 Pac. 75; Morgan v. King, 27 Colo.
539, 63 Pac. 416; Robbins v. Butler, 24 Ill. 387; Jarrett
v. Johnson, 216 Ill. 212, 74 N. E. 756; Frazier v. Jeakins,
64 Kan. 615, 68 Pac. 24, 57 L. R. A. 575. In the case of
Tenison v. Patton, 95 Tex. 284, 67 S. W. 92, the court
says:

"The corporation is a separate entity, for which its board of
directors acts. The persons having the beneficial interest in
the property are the stockholders, but their rights are cen-
tered in the corporation, and are managed and controlled
through the board of directors, as the active representative
of the company; and it is through it and not the stockholders
that business dealings are carried on. When a personal in-
terest of one of them springs up adverse to that of the cor-
poration, it disqualifies him to act concerning it as one of the
representatives or agents. But the others do not lose their
representative capacity, and still have power to bind the com-
pany. The disqualified director cannot deal with them as a
stranger, because the position of confidence which he has held
has enabled him to gather an intimate knowledge of the af-
fairs of the corporation and to exercise influence upon those
associates with him in their management. But the company
is represented by those who alone can act for it, and if they
are disinterested, he can, we think, deal with them as any
other trustee can deal with the cestui que trust, if he makes
a full disclosure of all facts known to him about the subject,
takes no advantage of his position, deals honestly and openly
and concludes a contract fair and beneficial to the company.
The board, in such transactions, acts in a fiduciary capacity
to the stockholders, and for this reason should not be al-
lowed, in making a contract with their co-director, to sacri-
fice the interest of those committed to their charge."

Gay v. Young Men's Consol. Co-op. Mercantile Inst.,
37 Utah, 280, 107 Pac. 237, is a comparatively recent de-
cision of the Supreme Court of Utah on facts somewhat
similar to those in the case at bar. The wife of Joshua
Gay, in order to secure an indebtedness of the latter to a
corporation, conveyed to it a certain parcel of land by deed
prescribing the condition that said corporation should re-
ceive and hold the title to said land in trust, and should
sell the same for the best price obtainable therefor, but
in no event for less than $300; and, that when said land

was sold, the corporation should retain out of the proceeds the amount of said indebtedness, and account to the wife for the balance of the proceeds of said sale. The land was sold soon thereafter to one Rockhill, a director of trustee corporation, for the sum of $300, and he in turn within a few days thereafter sold to one King for the sum of $500. The court held that this transaction rendered both the corporation and Rockhill, the director, liable to the wife for the difference between the amount of said indebtedness and $500, the price at which said property was sold by the director. Among other things, the court said:

"The obligation of the corporation, therefore, was in the nature of a trust, and its relation to respondent and the fund was in the nature of a trustee, and we shall so treat it. The corporation in selling the property was bound to sell it for the 'best price that could be obtained' therefor. If the property was sold for a less price, the corporation would still be liable to respondent for the difference between what the property was actually sold for and what the corporation could have obtained for it. If the property in question, therefore, was sold for $500, as found by the court, on the 26th day of July, 1906, then that amount was obtainable for it on that date. It is contended that the land was sold by the corporation to Rockhill on the 21st day of July, 1906, for the sum of $300, and therefore the corporation is required to account for that sum only. For the reasons hereinafter stated we cannot treat the transfer of the property to Rockhill as a sale, and hence we are of the opinion that the corporation is clearly liable under its trust agreement."

After thus disposing of the liability of the trustee corporation, the court then deals with the position of the director. The opinion proceeds:

"But is the appellant Rockhill also liable to the respondent? The answer to this question depends upon two things, namely, Rockhill's relation to the corporation, and the character of the transaction by which it obtained title to the land in question. Rockhill's relation to the corporation is that of director and vice president."

Then occurs a somewhat lengthy discussion of the knowledge with which an officer of a corporation is chargeable, after which the court concludes as follows:

"Under the court's findings in this case, when viewed in the light of the law applicable to them, the transaction by

which Rockhill obtained title to the land in question on the 21st day of July, 1906, amounted to no more than to constitute him a trustee for the respondent. The property, which was therefore held in trust for respondent by the corporation, was after the transfer held in trust for her by Rockhill. * * * As we have seen, Rockhill is in no better plight than the corporation, since he simply stands in its shoes, and, in so far as respondent's rights are concerned, is bound by the trust agreement the same as the corporation would be. The corporation could thus discharge its obligations only by complying with the trust agreement, and, in doing so, would have to account to respondent for her proportion of the $500 which was the sale price of the property. Rockhill became a volunteer trustee, and has obtained and holds the fund derived from the sale of the land, and hence we can see no good reason for holding that he should not be required to account to respondent for the amount due her under the trust agreement in accordance with its terms, all of which the law assumes that Rockhill knew."

In the case of Purchase v. Atlantic Safe Deposit & Trust Co., 81 N. J. Eq. 344. 87 Atl. 444, real estate was held in trust by the corporation for purposes of sale. It was, without the knowledge of its board of directors, purchased by one of its directors through a third person. In such case the court held the purchasing director absolutely liable to the cestui que trust for all profits realized out of the transaction. The remarks of the court are so pertinent and the facts of the case so similar to those in the case at bar that we quote from the opinion of the vice chancellor at somewhat greater length than usual. The court said:

"Now the other branch of this case involves the responsibility of Mr. Mason, who admittedly, while a member of the board, purchased property which the institution which the board represented held in trust for complainants. That he is liable for any losses that have been sustained by the cestuis que trust, or is liable for any profits that he may have obtained in the transaction, there cannot be a shadow of doubt. * * * Another element exists in the case which I would not like to finally determine at this time, although I feel well convinced in my own mind, but I think I should wish to hear further from counsel before finally determining it; that is, touching the $1,000 paid to Mr. Mason by the trust company for commissions. My present view is that a company holding a property in trust for purposes of sale would have no right, power, or authority to pay commissions to a member of its board for finding a purchaser. If such a company is permitted to pay commissions to a member of its board, it is permitted to pay commissions to any number of members of its board, which

128 SUPREME COURT OF NEW MEXICO,

H. B. Cartwright v. U. S. B. & T. Co., 23 N. M. 82.

would be in effect a board paying commissions to itself. It
seems to me that the transaction is one that it against pub-
lic policy; that a real estate agent who for commissions
makes a sale of property for a company,. which property the
company holds in trust, must be a man outside of the com-
pany. The desire to earn commissions seems to me to be in-
compatible with the performance of the duties which belong
to the director as such. If this be true, the trust company
and Mr. Mason would be jointly liable to the cestuis que
trust for' the return of that money, with interest, and I shall
so determine, unless' briefs from the respective counsel con-
vince me that I am in error as to this. I will ask Mr. French,
on behalf of the trust company, to submit a brief upon that
point, if he is convinced I am in error, and to submit what-
ever briefs he wishes to submit on that point to Mr. Carr be-
fore its presentation to me, or with its presentation to me."

After the case had been considered upon briefs filed by
the respective parties, the vice chancellor still adhered to
his original holding, and in a supplemental opinion said:

"Under the trust which was assumed by defendant corpor-
ation, it became the duty of that corporation to find an ad-
vantageous purchaser of the property of its cestuis que trust.
As that corporation could only act through its board, that
duty necessarily belonged to the board, and to each member
of the board. In finding a purchaser for the trust property,
a member of the board did no more than perform his plain
duty as a director, a duty which he owed alike to the corpora-
tion and to the cestui que trust of the corporation which he
was representing. The corporation and the cestui que trust
were alike entitled to the service which was performed by the
director, and were alike entitled to the free exercise of the
judgment of the director touching the desirability of the sale,
uninfluenced by hope of personal gain, for the relation of the
board to the cestui que trust was clearly in the nature of a
trust relation, notwithstanding the fact that the corporation
which the board primarily represented was the legal trustee.
The right of the corporation for compensation for the services
performed by it in effecting the sale as a part of its duty is
not questioned; but its right to pay to a member of its board
of directors, out of the fund of its cestui que trust, compensa-
tion for disclosing a purchaser for the trust property cannot,
in my judgment, be sustained. The right of the corporation
to compensation for services performed as trustee is entirely
distinct from its right to an allowance for an expenditure of
this nature.
"Another question arises from the peculiar circumstances
connected with the transactions already referred to. The de-
fendant corporation paid to its director, out of the funds of
the cestui que trust, a compensation for disclosing a purchaser
for the   *   *   *   property. At that time it was believed by
all the members of the board, except the director to whom

the payment was made, that the purchaser of the property was a stranger. It has since been ascertained the real purchaser was the director to whom the compensation was paid. That director is a party defendant, and has been already ordered to account to the cestui que trust for all profits flowing to him from the purchase. The item here under consideration may be appropriately classed as one of the items of profit made by the director through his purchase of the property. For this item both the director and the corporation are liable to the cestui que trust; for the other items for which the account is to be taken only the director is liable, as the sale of the property was made by the corporation in good faith, without knowledge of the fact that the director was a purchaser. Under these circumstances, the joint liability of the director and the corporation for the money paid to the director for disclosing a purchaser falls within the rule defined in McCartin v. Traphagen, 43 N. J. Eq. 323, 11 Atl. 156; for the corporation received no benefit from the payment and the director received the sole benefit; the liability for the return of the money should, in equity, be primarily cast upon the director and secondarily on the corporation."

Appellant Muller seeks to show that the creditors were not the beneficiaries under the trust agreement under which the corporation was acting, and hence cannot question his dealing in the manner stated with the corporation. This would undoubtedly be true if the creditors were not the beneficiaries under the trust. The contract between Muller and the corporation, in that event, could only be attacked by either the stockholders of the corporation or the cestui que trust, which would be the Ramon Land & Lumber Company. We have determined that the creditors were the beneficiaries of the trust, and, that being true, they could question the right of Muller, as a director of the trustee corporation, to retain the profit made by him in the transaction in question. Muller was a director of the trustee corporation, and knew that it was acting as trustee in the management and disposition of the trust property. He knew that there was a possibility of selling the trust real estate for the sum of $80,000. Possessed of this knowledge; he secured an option upon the property from his fellow directors, without disclosing the anticipated profits; and when he conceived the idea of reaping a personal profit from the sale of the trust property, his interest came into conflict with the interests of the cestui que trust, represented by his corporation. Not only this, but the inter-

ests of the other shareholders in the corporation came into conflict with his personal interests. His interest would have been subserved by securing an option at the lowest possible figure, while the interest of the cestui que trust and the shareholders of the trustee corporation demanded that the trust property be disposed of at the highest figure obtainable. The shareholders of the trustee would share beneficially in the distribution of the trustee's compensation based on the amount of its disbursements, and the cestui que trust would have their dividends increased proportionately to the increased price at which the trust property sold. He did not disclose to the directors of the trustee bank that he was about to realize a large profit as a result of his dealing with the trust property, or that he was making any profit at all. Furthermore, he not only failed to disclose to the directors of his corporation the profit which he expected to reap from the purchase of the trust property, but with full knowledge of the bank's trusteeship and the terms thereof, he purposely concealed the price at which he was proposing to sell the grant for fear they would go ahead and close the deal themselves.

The duty of a full disclosure of all the facts within his knowledge that might affect the action of his codirectors regarding the proposed purchase was a duty which was owing even as between him and the other shareholders of his corporation. He could not sustain his claim to retain the profits resulting from this sale when tested by ordinary rules governing the dealings between a director and his corporation, with such corporation divested of the highly fiduciary capacity in which it acted against attack by a shareholder of such corporation. A fortiori he cannot do so when the rigid rules respecting the purchase by a trustee from a cestui que trust intervene and intensify, as it were, the already fiduciary character of the dealings between a director and the corporation he represents.

The duties of a director towards his corporation must be measured by and commensurate with the corporation's duties with respect to the subject-matter of their dealing. The corporation can act only through its directors. And

where, as here, the corporation is a trustee, every director is immediately clothed with the habiliments of that trusteeship of which he cannot divest himself by any means whatsoever for the purpose of lending sanction to his dealings with the trust property for personal gain. His dealings will be subject to all the rules of equity which govern the relations of trustee and cestui que trust, including the rule which requires an accounting to the cestui que trust for any profits made.

The reasons for the strict application by the courts of the equitable doctrine above discussed are too apparent for extended discussion, and are fully justified by the facts in the case.

Frederick Muller's duty as a director of the trustee corporation required him to aid in the disposal of the trust property to the best advantage. He began to negotiate for the property himself, however, and it immediately became to his personal interest to secure its disposition at the lowest figure possible. Had he made the disclosure, which, under the law it was his duty to make, we should have to impute to his fellow directors a willingness to breach the trust agreement into which they had entered, to justify an assumption that they would ever have consummated an option agreement with appellant so favorable to him and so disastrous to the interests of the cestui que trustent.

Moreover, although it is not essential to entitle the cestuis que trustent to the relief prayed for that fraud be shown, and although no collusion between the directors and this appellant was shown, the court does find, and the finding is fully sustained by the evidence, indeed is supported by appellant's admission, that he concealed from them the price at which he proposed selling the trust property. Even when by reason of a better offer from another person, who, though not a director, disclosed his anticipated profit, the appellant increased the purchase price under his option from $50,000 to $53,500, he still did not disclose anything whatsoever regarding any profit he would reap from the transaction. Silence or no disclosure where there is a duty to speak will alone, and unaccompanied

by any element of active fraud be sufficient to ground an action for deceit. 20 Cyc. 15; Anderson v. Reed, 20 N. M. 202, 148 Pac. 502, L. R. A. 1916B, 862. Certainly, according to any view of this transaction, every duty springing from appellant's relationship to the trustee and the trust property demanded the fullest disclosure of the facts, which he not only did not make but purposely concealed.

But, as above stated, the liability of this appellant to account for the profits resulting from this sale are in no way dependent upon a showing of fraud, active or by concealment. It springs from the relationship he sustained to the parties and the property dealt with. Here there was not only the duty which Muller owed to the stockholders of his corporation but there was the added duty owing to the cestui que trustents. It would be going too far in such a case to require a showing of bad faith or fraud on the part of the director of the corporation before the court would set aside such a contract or require the director to account for the profits so made, and would establish a rule which would lead to opportunities for fraud and injustice. Courts have always required the utmost good faith upon the part of the trustee. All contracts by which the trustee makes a profit on purchases of trust property are universally set aside by the courts at the election of the cestui que trust. Only by the rigid adherence to such a rule can the rights of the beneficiaries of the trust be fully protected, and it would go far to destroy the beneficent effect of this rule if the court should say that a director of a trustee corporation could deal with his fellow directors relative to the trust property and retain to himself any profit which he might make as against the cestui que trust. In the present case we are satisfied that Muller and his fellow directors were acting in the utmost good faith, Muller under the assumption that he had the legal right to take the option in question and secure to himself the anticipated profits, and the directors likewise honestly entertained the belief that there was no impropriety in the making of such a contract; but the court cannot disregard the rules of law so long establishesd and so consistently ad-

hered to because in a given case adherence to the rule may work a seeming hardship, where disregard of the rule would lead to fraud and injustice without any opportunity to clearly establish such a fraud, if seeming good faith on the part of those dealing with the trust property would entitle the trustee or a director of the trustee to retain a personal benefit to himself at the expense of the trust estate. For this reason we are compelled to hold that the trial court properly denied Muller his right to recover.

Another point presented by Muller is that H. B. Cartwright & Bro. is estopped to question the right of Muller to retain the profit resulting from his purchase and sale of the trust property. Assuming, for the sake of argument, that Cratwright & Bro. was estopped, other creditors, not so estopped, have questioned his right, and for this reason it is unnecessary to consider the estoppel alleged against Cartwright & Bro.

[8] The appellant United States Bank & Trust Company complains of the action of the court in refusing to allow it a commission of $1,590, being 6 per cent. on the $26,500 claimed by Muller, and also for refusing to allow it a claimed attorney's fee of $1,000. Relative to the claimed commission on the $26,500, the bank in its answer filed in this case alleged that appellant Muller was entitled to the said sum, and that it was no part of the trust estate, and set up other allegations tending to show Muller's right to this fund in question. Both Muller and the bank were represented by the same attorney, and Muller in his answer adopted many of the allegations contained in the answer of the bank. We think the court was justified in finding that the bank had been an unfaithful trustee. Where a trustee is unfaithful to the trust, it is properly denied compensation. The court in such cases acts in the exercise of a sound discretion in refusing to allow compensation, which discretion will not be disturbed on appeal, except in a case of clear abuse.

"It might be supposed that the term "breach of trust" was confined to willful and fraudulent acts which have a quasi criminal character, even if they have not been made actual crimes by statute. The term has, however, a broader and

more technical meaning. It is well settled that every viola-
tion by a trustee of a duty which equity lays upon him,
whether willful and fradulent, or' done through negligence, or
arising through mere oversight and forgetfulness, is a breach
of trust. The term, therefore, includes every omission and
commission of either of the three great obligations already
described, of carrying out the trust according to its terms,
of care and diligence in protecting and investing the trust
property, and of using perfect good faith." Pomeroy's Eq.
Jur. 1079.

In Perry on Trusts, at section 919, the author speaks
concerning this subject, as follows:

"If they (trustees) are guilty of any breach of trust, or of
any vexations or improper conduct the courts can withhold
all compensation, or' they can allow such compensation as will
pay for the value of their services so far as they have been
beneficial to the estate."

Even though the trustee acts in good faith, if his con-
duct is a breach of trust, compensation will be denied.
Weakley v. Meriwether, 156 Ky. 304, 160 S. W. 1054.
And the refusal of a trustee to do his duty until com-
pelled deprives him of the right to compensation. Leh-
man v. Rothbarth, 159 Ill. 270, 42 N. E. 777.

It is axiomatic in the law of trusts and trustees that
the trustee shall receive no compensation where he denies
the trust. That is exactly what has been done by the trus-
tee in this case with respect to the $26,500. It has denied
the existence of a trust with respect to said fund, although
alleging a willingness to abide the judgment of the court
with reference thereto, excepting, however, and seeking to
overturn it on this appeal. Therefore there was no error
in denying it a commission upon said sum of $26,500.

The judgment of the district court, denying the bank
the right to take credit for the $1,000 attorney's fee was
proper, in view of the state of the record. The stipula-
tion under which this fee was claimed was not presented
to the trial court. It had evidently been misplaced and
was not available. It was not produced for inspection of
the trial court before judgment was rendered. It was
claimed by the attorney for the bank that it was an un-
qualified stipulation, and provided unconditionally for

such payment, and was signed by counsel for all the parties. Counsel for Cartwright & Bro. contended upon the argument that it was a conditional stipulation, and that any party to the proceedings had the right to question the legality of such payment. No offer was made by the bank to show by evidence the terms and conditions of the stipulation. The burden was upon it to sustain, by the terms of the stipulation, the payment to its attorney of this amount. Such being true, it failed to sustain the burden in this regard; hence the court properly disallowed it this item.

[**9, 10**] We will next consider the appeal of Haspelmath and the creditors joining with him, by which is presented the question of the validity of the preference given the claim of Cartwright & Bro. over the general creditors. As heretofore stated, Cartwright & Bro., in their complaint filed in the district court, characterized the trust agreement as an assignment for the benefit of creditors. If this be true, undoubtedly the attempted preference given them by the trustee was invalid. Without determining whether the trust agreement constituted an assignment for the benefit of creditors, to say the least, it was a trust agreement in which the creditors of the Ramon Land & Lumber Company were the beneficiaries, and in which all the general creditors were placed upon the same footing. In their brief Cartwright & Bro. attempt to sustain the validity of the preference upon two propositions: First, that the execution of the mortgage to it by the bank was justified by the exigencies of the situation confronting the trustee at the time of its execution; and, second, that the trustee was authorized by the provisions of the trust agreement, under which it acted, to do as it did in the premises, if such action became necessary for the preservation of the trust estate. A preference is also claimed upon another ground which will be hereafter considered, as it has no connection with the mortgage in question.

First, as to the authority of the trustee under the trust agreement: Under this agreement Cartwright & Bro. were placed in the same class as the other unsecured creditors,

and the trustee was given full authority, should it consider it best, to obtain title to the grant in order to prevent the forfeiture of the grant by the owners to do so and to take the title of said grant in its name, as trustee. We have heretofore determined that the Ramon Vigil Grant was subjected to the terms and provisions of the trust agreement, and, this being true, it would be governed thereby. Appellant claims that, the trustee having full authority to obtain legal title to the grant, and it being essential that it raise the amount of money necessary under its option to enable it to do so, it had the power to do whatever was necessary in order to obtain the money, even to the giving of a preference to a creditor for his unsecured claim. We do not believe that the trust agreement justifies such a construction. The creator of the trust stipulated and provided that Cartwright & Bro. should prorate with the other creditors; and, while the trustee was authorized to obtain title to the grant and could have borrowed from any source the moneys necessary to enable it to do so, or could have used the money of the trust estate for that purpose, we do not believe that it was competent for it to enter into an agreement with an unsecured creditor by which he should advance to it the necessary money under an agreement by which such creditor should secure a decided advantage over all the other creditors.

It is true the district court found that application had been made to the other creditors to assist in furnishing the money necessary to enable the trustee to take the legal title to the grant. While this finding is probably not supported by the evidence, yet it is not questioned by appellants. If we accept it as true, it does not aid Cartwright & Bro. The application to the other creditors for financial assistance, if such was made, was in December, 1910, before the execution of the trust agreement in February, 1911. There is no showing made that any representation was made to the other creditors to the effect that this money was necessary in order to save the equity in the real estate; nor was it represented to them that such creditors as advanced money for this purpose would be given

preference as to their unsecured·claim. The facts relative to this matter may be briefly stated as follows:

Cartwright & Bro. was the largest creditor of the Ramon Land & Lumber Company, their account amounting to something more than $12,000, for which they had no security whatever. At the time the trust agreement was consummated it was expected that a speedy sale of the grant might be arranged by which the equity would be preserved. A man named Brook, who acted as an agent for the trustee, testifies that he sent a circular letter to the creditors, asking them to contribute toward the refinancing of the company. Apparently at that time he was proceeding in accordance with the plan proposed in the letter of Hanna & Wilson, which is set out in the statement of facts herein. Afterwards, however, this plan was abandoned, and it was decided to acquire title to the grant and sell the same. Cartwright & Bro. advanced certain moneys for the payment of taxes and· other charges prior to the 1st day of July, 1911. Shortly before the 1st day of July, 1911, when the option of the United States Bank & Trust Company was about to expire, Judge Laughin appealed to Cartwright & Bro. to advance the necessary money, something over $6,000. for the purpose of reducing the amount owing to Smith and Stebbins and enabling the bank to obtain a deed to the real estate. This Cartwright & Bro. agreed to do in consideration of the bank, as trustee, executing to it a second mortgage on the real estate, securing not only the moneys advanced for the purpose of securing title to the grant, but likewise its unsecured claim of something more than $12,000. The fact that the trustee was proposing to execute this mortgage for the unsecured claim was unknown to the other beneficiaries of the trust. That the bank was authorized to execute the mortgage to secure the money advanced by Cartwright & Bro. is not questioned, and certainly it is entitled to be paid out of the common fund the money it advanced, together with interest thereon and the costs and expenses which it incurred for the benefit of the trust estate. At section 1085, Pomeroy's Eq. Jur., the author says:

"Although in general a creditor who advances money to a trustee obtains only the personal liability of the trustee, and has no demand enforceable against the estate, yet if the expenditure is authorized, and the loan is necessary, the trustee may, at the time of procuring the advance, whether money or services, by an express agreement with the creditor, make the demand a charge upon the estate, and thus create a lien in favor of the creditor."

Practically all of the unsecured creditors assigned their claims to the trustee, subject to the trust agreement, and over 80 per cent. in amount appeared, claiming benefits under its terms and affirming its provisions. Cartwright & Bro. filed its claim with the trustee and thus gave their assent to the provisions of the trust agreement. However, in this country, "if an assignment, not fraudulent, is made to a trustee for the benefit of creditors, their assent is not necessary, or their assent will be presumed in all cases if it is for their benefit and contains no unusual clauses or restrictions." Perry on Trusts (6th Ed.) § 593; Burrill on Assignments (6th Ed.) § 90. Furthermore, by assigning their claims to the trustee, the creditors did become actual parties to the trust agreement. Burrill on Assignments (6th Ed.) p. 129, § 428. Thus at the time the trust agreement was executed it became in effect a tripartite agreement, binding in all its terms upon the assignee, assignor, and creditors equally. It is elementary that thereafter no modifications of any of its terms could be made by any of its parties without the agreement of all, and that the powers and duties of the trustee were limited strictly by its terms.

"The powers of trustees under deeds of trust, and of mortgagees under mortages with power of sale, depend entirely upon the terms of the deeds. Such powers are created by, and exist in the deeds, and of course they exist in the terms in which they are created, and in no others. They are to be exercised by the trustees in pais. They are wholly matters of convention and contract between the parties, and not of law or jurisdiction. They can be exercised because they are conferred by one party upon another, and not because the law or the courts have conferred or authorized them." Perry on Trusts (6th Ed.) vol. 2, § 602.

It follows that the trustee's exercise of authority must be construed solely in the light of the trust agreement. No

other considerations can weigh in the determination of this question. It is a matter of simple contract, and in no wise complicated or difficult. If the trust agreement did not confer the power upon the trustee to prefer one unsecured creditor over another, then the attempted exercise of that power is void and can avail nothing.

"If all parties proceed under the deed, the trustees must find their power in the deed of assignment or settlement, and they must proceed in accordance with it in selling the property and in paying the debts; if preferences are made, the trustees must pay them; if all are to be paid equally, the trustees must pay in that manner. If the trust is to pay only a certain class of debts, or a certain number of debts named, the trustees must confine themselves to their power. The principle on which this rests is that the assignor was the owner of the property, and he could give such directions as to the disposal of it as he pleased; and, so long as the law does not interfere to set aside the assignment, the assignee must follow the only power given to him, to-wit, the deed of assignment." Perry on Trusts (6th Ed.) vol. 2, § 597.

"The principal duties which devolve upon the assignee by his acceptance of the trust are those marked out by the assignment itself, namely, to take possession of the property assigned, to convert it into money by the process of collection and sale, and to distribute the proceeds among the creditors entitled." Burrill on Assignments (6th Ed.) p. 483.

The trustee "must be governed throughout by the terms and provisions of the deed, so far as they can be legally pursued."

"All the acts of the trustees within the scope of their authority conferred by the deed, and within the duties imposed by the law, bind the creditors, debtor and themselves; unauthorized acts do not, and they may be required to account for the misapplication of the fund or omission of duty." Burrill on Assignments (6th Ed.) p. 484; Burrill on Assignments, supra, § 350.

"Title is vested in the assignee for the purpose merely of executing the trust in the manner directed." Burrill, supra, p. 480.

Furthermore, it knew what the contents of the trust agreement were at the time it was executed, and at no time prior thereto did it stipulate that its unsecured claim should be preferred in consideration of its advances, or that the deed should contain any provision permitting the trustee to prefer the claim for said consideration. Therefore the deed of assignment conferred no such power upon the trustee. It appears from the evidence, and is nowhere

denied, that prior to the execution of the deed of assignment, it was agreed that Cartwright & Bro. should have a second mortgage to cover all their advances.

From the testimony it appears that about June 28, 1911, four months after the execution of the deed of assignment, when the time arrived for Cartwright & Bro. to pay the amount necessary to reduce the purchase price down to $33,000, they stipulated that not only their advances, but also their unsecured claim, should be included in the second mortgage. It is admitted that none of the interested parties was notified, nor was their consent asked, to this violation of the terms of the deed of assignment. Until the note and mortgage were executed and the latter recorded, no one had notice, either actual or constructive, of the attempted preference. If Cartwright & Bro. had stipulated with the lumber company at the time the assignment was drawn that in consideration of its advances to save the equity its unsecured claim should be preferred, and this had been inserted in the deed of assignment, there is no doubt that the preference would have been valid, since "in cases free from fraud assignments usually operate according to their precise tenor and purport, and to the intention of the assignors in making them."     Burrill, supra, p. 353. The order of payment of the creditors is clearly set forth in the deed of assignment as follows:

"The said party of the second part agrees to administer the affairs of the party of the first part for the interest of the stockholders and creditors of the party of the first part, and to apply the net proceeds derived from the disposition of any and all of the assets of the said party of the first part, as follows, to-wit:

First:     To the payment of labor liens which have accrued, or may accrue against said party of the first part.

"Second, To the payment of creditors of the party of the first part by discharging the obligations due to the secured creditors first, and thereafter the obligations of the unsecured creditors.

"Third, It is further agreed and understood that if the party of the second part considers it best to obtain title to the grant called the Ramon Vigil Grant, .n which the party of the first part has an equity of twenty thousand dollars ($20,000) to this date, in order to prevent the forfeiture of the grant by the owners of said grant, under the terms of the contract between the owners of said grant, and the party of the first

part, it shall have full authority to do so and to take the title of said grant in its name as trustee, and to dispose of the same at any time within five months from date at not less than three dollars ($3.00) per acre, and during the period between five months from date and seven months from date at not less than two and 50-100 dollars ($2.50) per acre, and after that at not less than two dollars ($2.00) per acre and on such terms as may be agreed upon between the party of the second part and the creditors of the party of the first part."

Any attempt to privately prefer one creditor over another in a manner not provided for in the deed of assignment is fraudulent and void. The rule is laid down in Burrill as follows:

"Where a preference is privately given to one or more creditors over others, contrary to the principle and professed object of the deed of assignment itself, it is clearly fraudulent and void. * * * And the rule is the same whether the agreement be voluntary on the part of the debtor, with the object of inducing the creditor preferred or other creditors to agree to the composition; or whether the preference be extorted by the creditor by holding out a threat of refusal to sign. And in a case where a creditor refused to accede to the proposed composition until the debtor's brother agreed to supply him with coal equal in value to the residue of the debt, which agreement was unknown to the other creditors and was fully performed by the brother, it was held that the creditor could not recover upon the note given him for the amount of the composition. The doctrine established by the preceding cases has also received the sanction of the courts in this country. The same rule against secret preferences has been applied in England and in the United States to cases of deeds of trust for the benefit of creditors ratably where the creditors became parties or agree to release the debtor on receiving their proportion of the trust fund." Burrill, supra, pp. 190, 191.

And this rule has been applied to cases of the direct transfer of property to the creditor preferred. Edrington v. Rogers, 15 Tex. 188; Hancock v. Horan, 15 Tex. 507.

Thus there being no provision in the trust agreement authorizing the trustee to give the preference, it cannot be justified thereunder; nor can it be justified by reason of the exigencies of the situation which confronted the trustee at the time of the execution of the mortgage. It would be a dangerous rule to establish to permit a trustee under a deed of assignment or a trust agreement to prefer an unse-

cured claim of a beneficiary by reason of advancement made by the beneficiary to the trustee for the preservation of the trust estate. The authorities go to the extent, we think, of permitting the party making the advance to secure a lien upon the trust estate for the money so advanced, but do not, we believe, go any further. If the rule were established in conformity with the view of the appellee, it would be possible for a creditor to secure an unjust advantage over other creditors by making such advancements. Appellee has cited no authority, and in fact we believe none can be found, justifying his claimed preference under either of the foregoing propositions. For this reason we are compelled to hold that the mortgage, in so far as it attempted to secure the pre-existing indebtedness owing Cartwright & Bro., was invalid, and that they have no claim upon the fund in preference to the other creditors as to such prior indebtedness because of said mortgage.

It is further contended that Cartwright & Bro should be given a preference as to the $26,500 claimed by Muller, which it insists by its proceeding in this case was restored to the trust estate. In support of this contention, appellee cites the following cases: Reis v. Ravens, 68 Ill. App. 53; Johnson v. Blell, 61 Mo. App. 37; In re Price, McCormick Co., 171 N. Y. 15, 63 N. E. 526; Merwin v. Richardson, 52 Conn. 223; 5 C. J. 1278. In 5 C. J. 1278, it is said:

"A creditor of an assigned estate who has, by the exercise of superior diligence, discovered and uncovered property and has thus enlarged the fund is entitled to a preference over other creditors."

The text is evidently based upon a statement by the court in Reis v. Ravens, supra.

The court in this case uses language which would justify the text, but no such point was involved in that case, and no other authority cited so holds. The general rule is stated in the case of Merwin v. Richardson, supra, to be that:

"Where one incurs expense in rescuing property belonging to many, a court of equity has power unquestionably to direct that the expenses so incurred shall be paid from the common fund."

We believe that this is the limit of the right of a party in such a case, but there is another reason which conclusively establishes the fact that appellee was not entitled to a preference on this ground, if we assume the rule to be as stated in Corpus Juris. Appellee instituted this suit in the district court for the purpose of requiring Muller and the trustee to account to the creditors for this fund. It invited all the other creditors to join with it in this suit. Some joined in the complaint filed by it in the court below; the remainder appeared by a separate attorney and assisted in the prosecution of the suit against Muller and the trustee, and in the same complaint attacked the preference claimed by Cartwright & Bro. This being true, it cannot be said that Cartwright & Bro. alone and unaided secured the return to the trust estate of the $26,500; hence they would not be entitled to a preference on this ground.

[11] As to the appeal presented by Francis C. Wilson, assignee of the claim of Hanna & Wilson, it is sufficient to say that the trust agreement specifically provided for the payment to them of a fee of $8,000 by the trustee, in the event that the real estate was sold for $2.50 per acre, which was found by the trial court to be the selling price for the same. This being true, it was the duty of the trustee to pay this attorney's fee in preference to the other creditors of the trust estate. In the Matter of Lewis, 81 N. Y. 421, the court said:

"The assignee derives all his power from the assignment, which is both the guide and measure of his duty. Beyond that, or outside of its terms, he is powerless and without authority. The control of the court over his actions is limited in the same way, and can only be exercised to compel his performance of the stipulated and defined trust, and protect the rights which flow from it. He distributes the proceeds of the estate placed in his care, according to the dictation and under the sole guidance of the assignment, and the statutory provisions merely regulate and guard his exercise of an authority derived from the will of the assignor. The courts, therefore, cannot direct him to pay a debt of the assignor, or give it preference, in violation of the terms of the assignment and the rights of creditors under it. To hold the contrary would be to put the court in the place of the assignor and assert a right to modify the terms of the assignment, after it had

taken effect, against the will of its maker, and to the injury of those protected by it. We agree that the assignee is merely the representative of the debtor and must be governed by the express terms of its trust."

This case then cites the case of Nicholson v. Leavitt, 6 N. Y. 510, 57 Am. Dec. 499. In the case of Hulse v. Marshall, 9 Mo. App. 148, the court said:

"The deeds show upon their face that it was the intention of the assignors that all the creditors should be paid pro rata. No provision is made for individual creditors, and nothing points to any distinction. It is thus clear that the assignee was right in refusing to make a difference not warranted by the terms of his trust. There had been no attempt to attack the assignment; and if no one complained, the assignee's duty was to follow the provisions of the deed, as plainly expressed, not to attempt to alter them, thus substituting himself for the tribunal which might pronounce on the question when it was properly raised. Until so raised, assent of creditors must be assumed by the assignee, especially in a case like the present, where, if the deeds can be said to contravene the law at all, they certainly contravene it by no plainly repugnant provisions, which may at once be rejected as contradicting the statute."

Quoting from the case of Hatchett v. Blanton, 72 Ala. 423:

"It cannot be doubted, that when a debtor voluntarily assigns property for the security and benefit of creditors, if the creditors choose to accept the assignment they must abide by its terms and provisions; they must take it as an entirety; they cannot accept in part and repudiate in part." Perry on Trusts, § 596; Burrill on Assignments (3d Ed.) § 479. "The creditors may have rights with which the assignment, so far as it confers rights upon others, is inconsistent. The assignment may derogate from, instead of extending to him the measure of right to which he is entitled If that be true, he must elect whether he will accept the assignment, or whether he will reject it, and stand upon the right he may have independent of it. He cannot elect to claim under the assignment the rights given by it, and repudiate it so far as it passes rights to others which are inconsistent with independent, distinct rights to which he may be entitled."

In the case of Cavanaugh v. Morrow, 67 How. Prac. (N. Y.) 241, the court said:

"When a debtor, in failing circumstances, has made an assignment of his estate for the payment of his debts, his creditors may come in under the assignment and insist that

the assignee shall, with fidelity, execute the trust in pursuance of the instrument. Or the creditors may stand aloof, refusing to recognize the validity of the instrument on the ground of actual fraud or other illegality, and they may institute appropriate proceedings at law or in equity to test the validity of the assignment in the courts. Creditors have an election as to which course they will adopt. They cannot pursue both. Creditors cannot in one moment take steps in recognition of the assignment, and in the line of its strict enforcement, according to its terms, and seek to hold the assignee to its performance, in the next repudiate it as fraudulent and void. The principle of election rests upon the equitable grounds that no man can be permitted to claim inconsistent rights with regard to the same subject. * * * A person cannot accept and reject the same instrument, or, having availed himself of part, defeat its provisions in any other part; and this applies to deeds, wills, and all other instruments whatever.' "

The trust agreement having made provision for the payment of this fee of $8,000, and having been accepted by the other creditors, they cannot now attack this provision and defeat the recovery of the compensation provided for the attorneys who prepared the trust agreement and conducted the negotiations leading to its consummation.

For the foregoing reasons, the judgment will be affirmed in so far as appellant Muller was denied the commission claimed by him for the sale of the grant, and also affirmed as to the compensation fixed for the trustee and the disallowance of the claimed attorney's fee of $1,000. It will be reversed as to the preference given Cartwright & Bro. on its open account, and in so far as it denied Francis C. Wilson a preference as to his attorney's fee, and remanded to the district court for further proceedings consistent with the views herein expressed.

PARKER, J., and LEAHY, District Judge, concur.